E12

EXHIBIT 3

| | | |
|---|---|---|
| SAMPSON K. KYERE, JR., MD, PhD.<br>5134 Northern Fences Lane<br>Columbia, MD. 21044<br>Plaintiff, | * | IN THE CIRCUIT COURT FOR BALTIMORE CITY |
| v. | * | |
| LifeBridge Health, Incorporated<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | * | Case No. 24-C-23-005020 |
| Serve on:<br>Jason H. Weiner, Esq.<br>General Counsel<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | * | *JURY TRIAL DEMANDED* |
| Daniel Durand, MD<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | * | |
| Serve on:<br>Daniel Durand, MD<br>2616 Chestnut Woods Court<br>Reisterstown, MD. 21136 | * | 2023 NOV 27 PM 3:45<br>CIVIL DIVISION |
| Elizabeth Zadzielski, MD, MBA,<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | * | |
| Serve on:<br>Elizabeth Zadzielski, MD, MBA<br>14309 Oak Meadow Road<br>Baldwin, MD. 21013 | * | |
| Omar Zalatimo, MD, MPH<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | * | |
| Serve on:<br>Omar Zalatimo, MD, MPH<br>906 Monaghan Court<br>Lutherville, MD. 21093 | * | |

**Unknown Members of the Impaired** *
**Practitioner Committee formed Under the**
**Sinai Hospital Medical Staff Bylaws** *

**Defendants.** *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT

Plaintiff, Sampson K. Kyere, MD, PhD ("Dr. Kyere), by and through undersigned counsel, hereby sues LifeBridge Health, Incorporated ("LBH") for disability discrimination, retaliation, constructive discharge in violation of State Government Article § 20-606 and civil conspiracy to commit unlawful and tortious acts, as well as breaches of employment contract and medical staff bylaws, and Dr. Daniel Durand for tortious interference with contract, gross negligence, and civil conspiracy to commit unlawful and tortious acts, and Drs. Elizabeth Zadzielski and Omar Zalatimo for gross negligence and civil conspiracy to commit unlawful and tortious acts. This is an action for declaratory and monetary relief to secure protection of and redress for the deprivation of rights guaranteed by state law.

## JURSDICTION AND VENUE

1. This action is brought pursuant to Md. Code Ann., State Gov't § 20-606.

2. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud. Procs. § 6-103, as Defendant, LBH, performs work and service in the state of Maryland.

3. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud. Procs. § 6-102 as Defendant, LBH, is organized under the laws of the state of Maryland and Defendants Drs. Durand, Zadzielski and Zalatimo are domiciled in the state of Maryland.

4. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud.Procs. § 6-103, as Defendants caused tortious injury within the state of Maryland.

5. Venue is proper pursuant to Md. Code. Ann., State Gov't § 20-1013(b) because the unlawful employment practice occurred in Baltimore City, Maryland.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES WITH RESPECT TO STATE GOVERNMENT ARTICLE CLAIMS AND CAUSES OF ACTION

6. Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office on September 14, 2022.

7. On June 12, 2023, EEOC issued a Determination Letter finding that LifeBridge Health engaged in unlawful employment discrimination in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008.

8. Pursuant to Md. Code. Ann., State Gov't § 20-1013(a), Plaintiff has exhausted his administrative obligations and may therefore bring this civil action.

**PARTIES**

9. Plaintiff, Dr. Sampson Kwame Kyere, Jr., is an adult resident of Maryland.

10. Defendant LBH operates 5 acute medical care centers and nearly 150 locations throughout the region, including in Baltimore City, Maryland.

11. Plaintiff worked for Defendant from June 2016 to September 15, 2022, primarily at LBH's Sinai Hospital in Baltimore City, Maryland.

12. At all times relevant to this Complaint, Dr. Daniel Durand was an employee of LBH and the Chairman of the Department of Radiology. Dr. Durand was the immediate supervisor of Dr. Kyere and is being sued in his individual capacity.

13. At all relevant times relevant to this Complaint, Dr. Elizabeth Zadzielski was an employee of LBH and the Chair of the Impaired Practitioner Committee convened to evaluate Dr. Kyere's ability to provide safe patient care. Dr. Zadzielski is being sued in her individual capacity.

14. At all relevant times to this Complaint, Dr. Omar Zalatimo was an employee of LBH and President of the Sinai Hospital Medical Staff. As President of the Medical Staff, Dr. Zalatimo was a member of the Impaired Practitioner Committee convened to evaluate Dr. Kyere's ability to provide safe patient care. Dr. Zalatimo is being sued in his individual capacity.

15. At all times relevant to this Complaint, Plaintiff was an "employee" of LBH under Md. Code Ann., State Gov't § 20-601(c).

16. At all times relevant to this complaint, LBH was Plaintiff's "employer" under Md. Code Ann., State Gov't § 20-601(d).

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17. Dr. Kyere filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office on September 14, 2022.

18. After an investigation, EEOC issued a Determination Letter finding reasonable cause to believe that LBH had engaged in unlawful employment discrimination in violation of the Americans with Disabilities Act (hereinafter referred to as "ADA") by subjecting Dr. Kyere to prohibited medical examination inquiries based on his disability, retaliated against him for requesting a reasonable accommodation, and discriminated against him, which culminated in his constructive discharge from his position.

E15

19. EEOC's attempts to conciliate the matter failed, and a Right to Sue letter was issued by EEOC on August 30, 2023.

20. Pursuant to Md. Code. Ann., State Gov't § 20-1013(a), Dr. Kyere has exhausted all administrative remedies and may therefore bring this civil action.

**FACTS COMMON TO ALL COUNTS**

21. Dr. Kyere is an Interventional and Diagnostic Radiologist, board certified in both specialties by the American Board of Radiology.

22. An interventional radiologist is a physician who performs minimally invasive image guided procedures. A diagnostic radiologist interprets imaging studies for diagnosis and treatment of patients.

23. Dr. Kyere earned his Doctor of Medicine and Doctor of Philosophy (in biochemistry) from the University of Maryland School of Medicine. He completed his diagnostic radiology residency at the University of Maryland Medical Center. After residency, Dr. Kyere also completed his vascular and interventional radiology fellowship at Johns Hopkins Hospital.

24. Plaintiff began his employment with LBH in June 2016.

25. Prior to his constructive discharge in September 2022, Dr. Kyere was employed by LBH under an employment agreement effective June 1, 2021 and continuing through June 30, 2024.

26. Throughout Dr. Kyere's employment with LBH, he had a reputation of being a very competent and capable Interventional Radiologist, who was trusted and respected by hospital administration and referring physicians who routinely referred to him complex patient cases.

27. Throughout his employment with LBH, Dr. Kyere was also promoted to many positions, including Vice Chief of Radiology, Medical Director of Interventional Radiology, member of the Sinai Hospital Medical Executive Committee, and member of the Sinai Hospital Multi-Disciplinary Peer Review Committee, which he held at the time of his constructive discharge in September 2022.

28. On March 1, 2022, Dr. Kyere made a request to Dr. Durand for a reasonable accommodation of a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician. At the time, Dr. Kyere was under the care of his treating physician for a health condition that impacted his gait.

29. Prior to March 1, 2022, LBH and Dr. Durand were aware of changes in Dr. Kyere's gait which had become apparent to Dr. Kyere's coworkers and other employees at LBH.

30. Prior to his request for a reasonable accommodation, Dr. Kyere had never denied changes in his gait. In October 2021, five months before he requested a reasonable accommodation, Dr. Kyere personally scheduled a meeting with Dr. Durand to explain to him that he had been experiencing lumbar spine pain which was affecting his gait and that he was working with treating physicians to obtain treatment for his condition.

31. Despite changes in his gait, Dr. Kyere performed hundreds of procedures and continued to work full time and provide call coverage during evenings and weekends until his modified schedule was granted.

32. After Dr. Kyere requested a reasonable accommodation of a modified work schedule, it became immediately apparent that Dr. Durand preferred Dr. Kyere take leave under the Family Medical Leave Act (FMLA) or use his PTO in lieu of obtaining a modified work schedule as an accommodation under state and federal law.

33. Despite Dr. Durand's preference, Dr. Kyere insisted his request was for a modified work schedule as a reasonable accommodation and further clarified that although he was seeking a modified work schedule of three days per week in lieu of five days per week, he would continue to provide call coverage, perform all his duties as Medical Director, including being available on off days for consults, case reviews, and any other tasks he could perform remotely from home during his days off.

34. After much back-and-forth spanning a month about how Dr. Kyere could obtain a modified work schedule as a reasonable accommodation, Dr. Kyere retained legal counsel.

35. On March 28, 2022, Dr. Kyere sent an email to Drs. Durand and Alexander and informed them that the website to which he was directed to formally submit his request for a reasonable accommodation would not permit him to enter a request for a reasonable accommodation and requested that his legal counsel be able to confer with counsel for LBH to resolve this matter.

36. On March 30, 2022, Dr. Durand acquiesced to Dr. Kyere's suggestion and connected him to counsel for LBH, Jennifer Cohen, Esq.

37. On April 1, 2022, counsel for LBH informed Dr. Kyere's attorneys that LBH would grant his request for a reduced work schedule effective immediately and would pay him his full salary until a formal amended employment agreement evidencing the reduced work schedule could be ratified between the parties. Further, counsel for LBH indicated Dr. Durand would email Dr. Kyere to memorialize the new schedule.

38. In lieu of receiving an email from Dr. Durand memorializing this information, Dr. Durand texted Dr. Kyere to arrange a telephone call that evening. During the call, Dr. Durand confirmed Dr. Kyere's request for a modified work schedule was granted and was to begin effective immediately.

39. Dr. Durand also informed Dr. Kyere that a lead ultrasound technician reported she observed Dr. Kyere having dexterity issues during a procedure. Dr. Durand would not divulge to Dr. Kyere when the complaint was made, the date of the procedure, whether the patient suffered an adverse event or any harm, whether the procedure was performed properly or completed successfully, or any other details of the "report" or the procedure in question.

40. Much later, Dr. Kyere would learn this "report" by the lead ultrasound technician was never memorialized in writing but was made on March 3, 2022. On information and belief, this "report" by the lead ultrasound technician was solely related to subjective observation of Dr. Kyere's physical limitations and not related to any adverse patient safety event or his inability to perform a procedure.

41. Based on this report from the ultrasound technician, Dr. Durand stated he consulted with legal counsel and hospital leadership and there was a consensus to retain an independent Interventional Radiologist not affiliated with the hospital to observe Dr. Kyere performing procedures to ensure Dr. Kyere was not a threat to patient safety.

42. Dr. Durand also explained that the decision to make Dr. Kyere undergo an observation was also informed by a previous report from a staff member at Northwest Hospital in December 2020 and a report from Occupational Health in July 2021 that Dr. Kyere "seemed off."

43. Dr. Kyere was informed and questioned about these prior reports, all of which were related to subjective observations of Dr. Kyere's gait.

44. Prior to Dr. Kyere making a request for a reasonable accommodation, these "reports" were never deemed a patient safety risk, or formally investigated, but were dismissed because all reliable and objective evidence, such as Dr. Kyere's reputation among his peers, his ability to perform complex procedures, and his almost nonexistent complication rate, indicated Dr. Kyere was a capable and competent clinician who had a health condition which manifested as an abnormal gait.

45. It was only after Dr. Kyere engaged in a protected activity by requesting and obtaining a reasonable accommodation effective April 1, 2022, that these subjective prior observations of his gait became an indication to LBH that he may be a threat to patient safety which required a thorough investigation.

46. After Dr. Durand informed Dr. Kyere of LBH's intent to subject him to an observation, Dr. Kyere told Dr. Durand that he could not consent to such an observation without consulting with his attorneys.

47. On March 25, 2022, while Dr. Durand was attempting to thwart Dr. Kyere's efforts to obtain a reasonable accommodation, and to bolster the "report" from the lead ultrasound technician, LBH held a meeting with Dr. Kyere's staff to inquire about whether they had any information tending to prove he was a patient safety risk. Two Interventional Radiology technicians, Mark Fishel and Tarija Glenn, who scrub into every procedure with

Dr. Kyere to provide assistance to him during procedures, both stated they had no concerns about Dr. Kyere being a patient safety risk.

48. Representations made by Mr. Fishel and Ms. Glenn during this meeting unequivocally refute the single unwritten report from the ultrasound technician. Nonetheless, the "report" from the ultrasound technician was articulated as the basis for a wide-ranging and unlawful investigation into Dr. Kyere's health by LBH.

49. On April 19, 2022, Dr. Kyere's attorneys wrote a detailed letter to LBH explaining that taking any employment action based on such information was unlawful. Such warnings, however, were entirely ignored by LBH as LBH made clear that Dr. Kyere would either consent to an observation or LBH would take some other action evidencing LBH's willful disregard of Dr. Kyere's right to be free from unlawful employment discrimination motivated by his disability.

50. Despite the hospital's purported serious concerns about patient safety after the March 3, 2022 "report" by the ultrasound technician, Dr. Kyere's clinical privileges were never restricted or revoked and Dr. Kyere was permitted to perform more than 200 procedures until he was constructively discharged from employment on September 15, 2022.

51. If LBH had *bona fide* concerns about patient safety relating to Dr. Kyere, his employment agreement, LBH's Medical Staff Bylaws, Impaired Practitioner Policy, and the Health Occupations Article of the Maryland Code all permitted LBH to summarily suspend Dr. Kyere's clinical privileges pending an investigation of Dr. Kyere's fitness to practice medicine.

52. LBH's failure to take any action to restrict Dr. Kyere's clinical privileges proves that there were no genuine concerns about Dr. Kyere's clinical competence or ability to provide safe patient care despite his disability.

53. LBH's lack of genuine concern about Dr. Kyere's ability to provide safe patient care is corroborated by objective evidence. In October 2021—just five months before Dr. Kyere requested a reasonable accommodation—Dr. Durand conducted a quality review of all physicians in the Department of Interventional Radiology and concluded that Dr. Kyere's complication rate was 0.1% over the prior two years, which Dr. Durand stated was the lowest complication rate he had ever seen. This quality review data was based on more than 5,500 interventional radiology procedures across all modalities Dr. Kyere had performed while employed by LBH.

54. LBH also has never identified a single adverse patient safety event related to Dr. Kyere that would cause concern about Dr. Kyere's clinical abilities, competence, or ability to provide safe patient care.

55. Based on LBH's articulated basis for an observation, Dr. Kyere informed LBH he would not consent to an observation.

56. Dr. Kyere reminded LBH that the nature of his medical practice allows LBH to do a post hoc review of any procedure he has ever performed. Specifically, during every interventional radiology procedure, whether performed by Dr. Kyere or any other provider, images of the procedure are captured and stored in the patient's medical record. These images would show the technique Dr. Kyere used during each procedure, the way each procedure is performed, and even the duration of the procedure.

57. Reviewing images captured during every procedure which is stored in every patient medical record is the most effective means of assessing the skill and safety of any Interventional Radiologist. As Medical Director of the Department, Dr. Kyere often employed this as a means to monitor other physicians in the Department.

58. On June 23, 2022, during one such post hoc review, Dr. Kyere discovered the comparator physician had embolized the wrong splenic artery branch on a patient, resulting in significant patient harm. This is generally deemed to be an unacceptable and significant complication in the field. Dr. Kyere immediately notified Dr. Durand and Assistant Vice President of Imaging, Jennifer Dorrough.

59. Although Dr. Durand acknowledged the comparator fellow physician's incident was "extremely troubling," this comparator physician continued to provide coverage without any investigation or oversight from the Department.

60. This comparator physician also had had several serious adverse patient safety events including, but not limited to, permanently embolizing the wrong organ, creating an air embolus in the aorta during an outpatient lung biopsy procedure requiring the patient to be admitted to the Intensive Care Unit, and placing a percutaneous gastrostomy tube in the colon leading to injury to the colon and causing the patient to go into septic shock before the patient was transferred to hospice and died. The frequency, rarity, and seriousness of these complications would lead any hospital to question the physician's competency and fitness to practice medicine. LBH, however, opened no investigation concerning this physician and did not restrict or revoke this physician's privileges.

61. On April 8, 2022, LBH forwarded Dr. Kyere a copy of the Medical Staff Bylaws, but informed him "[t]here is no formal complaint process or policy for procturing [sic]" despite LBH's ongoing efforts to make Dr. Kyere undergo an "observation."

62. On the same day, LBH also informed Dr. Kyere that another option to address its contrived and purported concern about patient safety is to conduct a Focused Professional Practice Evaluation (FPPE) which would be "transparent to the Medial Staff and to the hospital's Board of Directors" but "[t]o avoid that level of exposure in this case, we would like to proceed with observation outside of the FPPE process." To that end, LBH stated that it had "been working to arrange for observation, to be performed by a provider employed by a related entity who also performs catheter-directed procedures," like Dr. Kyere, and that "[s]uch observation is anticipated to take place on April 22."

63. Additionally, LBH also intended to schedule an additional "independent observation" of Dr. Kyere that would take place the week of May 2, 2022. LBH intended to schedule not one but two observations of Dr. Kyere. It was LBH's position that while Dr. Kyere "must consent to the observation, it is not optional."

64. On April 15, 2022, LBH forwarded Dr. Kyere its "Impaired Practitioner Policy" which establishes the Impaired Practitioner Committee (hereinafter referred to as "IPC"). Per the Medical Staff Bylaws, "[t]his committee will carry out the activities outlined in the Impaired Practitioner Policy to include matters of physical and mental health, and substance abuse of the Medical Staff."

65. The IPC is a medical review committee under the Health Occupations Article of the Maryland Code established by the medical staff which "[e]valuates the qualifications, competence, and performance of providers of health care" as well as "[e]valuates and acts on matters that relate to the discipline of any provider of health care." Md. Code Ann., Health Occ. § 1-401.

66. Per the policy, this IPC was established to "provide a process for identifying a practitioner whose ability to practice medicine with reasonable skill and safety is impaired due to a physical, psychiatric or emotional illness, notifying the appropriate person(s), and determining an appropriate response."

67. This policy also requires that "[w]henever a practitioner is suspected of being impaired or providing unsafe treatment resulting from impairment, a confidential report of the facts and practitioner behavior which led to such suspicion shall be made to the appropriate Department Chief ("Chief"). In turn, the Chief is required to "evaluate the credibility of the complaint, allegation or concern" and forward such report to the President of the Medical Staff "[i]f the concern appears to be valid, or if there has been more than one complaint regarding the same practitioner during any twelve month period."

68. In accordance with Maryland law, this policy further requires that "[a]ll reports of suspected impairment, the identity of the practitioner suspected to be impaired, proceedings and investigations relating thereto, and actions taken as a result of such reports, proceedings and investigations (with the exception of actions taken with respect to the practitioner's clinical privileges) ***shall remain confidential*** except as limited by law, ethical obligation, or when the safety of patients is threatened." (Emphasis added.)

69. Under Maryland law, the IPC is a medical review committee as the IPC was established to "[e]valuate[] the qualifications, competence, and performance of providers of health care." Md. Code Ann., Health Occ. § 1-401

70. LBH breached its own established policy, procedures, and bylaws with regard to investigating the potential "impairment" of a physician by scheduling an observation, and it had discussed Dr. Kyere's sensitive health information in a public forum not protected by Maryland law.

71. When LBH decided to ignore the protections afforded to physicians under its policies, procedures, bylaws, and Maryland law, it left all discourse concerning Dr. Kyere and his health condition open to any form of legal discovery, including medical malpractice suits.

72. LBH's conduct placed Dr. Kyere at risk of being reported to the Maryland Board of Physicians or the National Practitioner Data Bank as a mandatory observation such as the one proposed could be deemed a restriction on his medical privileges. Such a restriction of Dr. Kyere's clinical privileges requires a reporting to relevant authorities under state and federal law.

73. When Dr. Kyere's counsel pointed out such restrictions would be subject to reporting to the Maryland Board of Physicians and the National Practitioner Data Bank, LBH advised that it did not intend to restrict Dr. Kyere's clinical privileges, proving it had no genuine concerns about Dr. Kyere's ability to provide safe patient care.

74. On April 19, 2022, Dr. Kyere informed LBH in writing that he would not agree to an observation and requested an "alternative resolution" to this contrived matter.

75. The next day, LBH informed Dr. Kyere that all scheduled observations had been cancelled. However, LBH stated that it takes "seriously our obligation to ensure patient safety and cannot ignore the credible concerns that have been brought to the attention of the Radiology Department's leadership," and, to that end, such "credible" concerns "will be shared with the President of the Medical Staff, pursuant to Sinai's Impaired Practitioner Policy."

76. In the meantime, LBH continued to retaliate against Dr. Kyere with respect to Dr. Kyere's schedule, duties, and other terms of employment.

77. After granting Dr. Kyere a modified work schedule, LBH forwarded Dr. Kyere an Amended Employment Agreement that should have been limited to memorializing his new compensation and paid time off in accordance with his modified work schedule.

78. Instead, the proposed Amended Employment Agreement unlawfully changed Dr. Kyere's "terms, conditions and privileges of employment" by precluding him from taking additional calls although his original employment agreement permitted him to do so; restricting him from moonlighting for American Radiology although the previous agreement permitted him to do so; and altering his clinical schedule with a mandatory start time thereby eliminating his previous autonomy over his schedule.

79. On May 17, 2022, Dr. Kyere informed LBH that although he "is agreeable to the changes to his compensation and PTO, he will not agree to the other changes proposed."

80. LBH's attempt to modify the terms and conditions of Dr. Kyere's employment not related to compensation or PTO, after he obtained a modified work schedule as a reasonable accommodation, was discriminatory and retaliatory.

81. On May 24, 2022, LBH agreed to "leave the opportunity for additional call as it exists in the underlying agreement" and "remove the 8:00am start time from the amendment."

82. Although the Amended Agreement stated, "the Hospital ***no longer consents*** to the moonlighting activity set forth in Subsection 4.J" of his original Employment Agreement, LBH's new position was that Dr. Kyere "was never provided such consent." (Emphasis added.) Therefore, LBH was unwilling to take out the amended terms pertaining to Dr. Kyere's moonlighting activities with American Radiology.

83. Based on LBH's position with regards to his moonlighting activities, Dr. Kyere never signed the Amended Employment Agreement.

84. After April 1, 2022, the daily schedule, over which Dr. Kyere previously had complete autonomy prior to his request for a reasonable accommodation, was also now being changed without his knowledge or consent.

85. On April 8, 2022, just seven days after Dr. Kyere's reasonable accommodation was approved, Dr. Kyere received a text message from Dr. Durand stating "[p]er the schedule, which I have approved, you need to report to Northwest on Monday."

86. Although Dr. Kyere's contract states that Dr. Kyere will provide call coverage at Northwest Hospital, such coverage was for evening and weekend call coverage and when the assigned Interventional Radiologist at Northwest Hospital was absent. At the time, Dr. Kyere could not even recall the last time he had been asked to report to Northwest Hospital for day coverage.

87. In a subsequent telephone conversation, Dr. Durand explained that Dr. Kyere was being assigned to Northwest so that the Interventional Radiologist at Northwest can be trained at Sinai Hospital in cerebral angiograms and stroke therapy.

88. This contrived reason, however, was pretextual. Dr. Durand never explained why that physician could not come to Sinai for such training on days Dr. Kyere was scheduled off due to his new modified schedule. Dr. Durand knew Northwest Hospital was a much less desirable assignment for Dr. Kyere as Northwest Hospital had less complex patient cases, a smaller Interventional Radiology suite, and less sophisticated equipment with which to perform procedures.

89. During the early morning hours of April 18, 2022, Dr. Kyere received an amended schedule with changes he had not reviewed or approved. Again, Dr. Kyere was asked to report to Northwest Hospital. Dr. Kyere texted Dr. Durand to inquire why the change was made.

90. Dr. Durand indicated Dr. Kyere was being assigned to Northwest for his previously articulated reason—to allow the Northwest Interventional Radiologist to be trained in cerebral angiograms and stroke therapy at Sinai Hospital. When Dr. Kyere inquired why the physician could not do that training at Sinai on days he was scheduled off per his new modified schedule, Dr. Durand did not answer the question.

91. Realizing there was no credible answer to justify Dr. Kyere's Northwest Hospital assignment, Dr. Durand stated "[a]s usual I would say the answer is to run the service as you see fit on any given day" and it was agreed Dr. Kyere would work with the scheduler to prevent future changes to the schedule without his knowledge or consent.

92. Dr. Durand then began having Dr. Kyere scheduled to provide diagnostic coverage in lieu of interventional radiology coverage even though Dr. Kyere was hired as the Medical Director for Interventional Radiology and his employment contract did not outline any diagnostic radiology responsibilities.

93. Prior to Dr. Kyere's modified work schedule, he almost never provided diagnostic coverage and such coverage was limited to days there was an emergency or a shortage of diagnostic radiologists due to a holiday. In any event, Dr. Kyere had never been required to provide diagnostic coverage without giving his consent.

94. After obtaining his modified work schedule, scheduling Dr. Kyere for diagnostic coverage became much more frequent, and even regular.

95. During a meeting to discuss scheduling with Ms. Dorrough, Dr. Kyere was informed that he had been scheduled to provide diagnostic coverage per Dr. Durand's instructions. Dr. Durand gave these instructions without discussing it with Dr. Kyere or obtaining his consent.

96. LBH's attempts to relegate Dr. Kyere to Northwest Hospital and then to diagnostic coverage were retaliatory.

97. Dr. Kyere was often scheduled to provide diagnostic coverage while LBH paid for IR locums coverage,[1] which was not economical, as locums physicians are paid two to three times Dr. Kyere's salary to provide coverage. Dr. Kyere was also being asked to provide diagnostic coverage even though there was already adequate diagnostic coverage onsite.

98. On April 25, 2022, Dr. Kyere put these concerns into an email to Dr. Durand. In his reply, Dr. Durand explained that "[d]iagnostic staffing has been short and we have a glut of coverage for a variety of reasons."

99. On April 29, 2022, as the Medical Director for the Department, Dr. Kyere had a meeting to discuss department scheduling with Ms. Dorrough and scheduler Jiselle Gladden. During the meeting, Dr. Kyere asked Ms. Dorrough and Ms. Gladden not to schedule him for diagnostic coverage. Dr. Kyere also instructed them that no IR locums coverage should be scheduled when Dr. Kyere is on site as it is extremely costly for the hospital. Additionally, Dr. Kyere asked them to schedule his days off on Tuesdays and Thursdays as much as practicable so that he could schedule his Physical Therapy appointments consistently.

[1] Locums coverage is coverage on an as-needed basis from providers who are credentialed at LBH facilities but are not employed on a full-time basis by LBH.

100. Dr. Kyere also informed them that locums IR coverage for call[2] was not necessary when Dr. Kyere is scheduled to take call even if he is scheduled off that day pursuant to his modified work schedule. To avoid costly locums IR call coverage, Dr. Kyere made clear that he was willing to take evening call, even on days he was scheduled off.

101. All these requests were within Dr. Kyere's authority as the Department's Medical Director. After this meeting, LBH stopped scheduling locums IR coverage for weeks Dr. Kyere was taking overnight and weekend call.

102. On May 6, 2022, Dr. Kyere had a leadership meeting with Dr. Durand and Ms. Dorrough to address these scheduling issues. At this meeting, Dr. Durand referred to Dr. Kyere as "selfish," characterized Dr. Kyere's previous meetings with Ms. Dorrough and Ms. Gladden as "inappropriate," and referred to Dr. Kyere as an "obstructionist" who "can't be trusted."

103. On May 10, 2022, Dr. Kyere's attorney sent correspondence to LBH outlining these retaliatory events and incidents.

104. On May 12, 2022, after meeting with Dr. Durand and Ms. Dorrough, LBH sent an email to Dr. Kyere's attorneys stating he has been "scheduled for diagnostics because of the scheduling needs of the department." LBH represented that "[f]inding IR coverage in this staffing environment has required the department to commit a certain number of days per week to independent contractors" and that "[w]hen Dr. Kyere is covering diagnostics, we're still sending images off site for reading (i.e., we are not "adequately staffed").

105. LBH counsel later also explained that LBH had employment agreements with the IR doctors providing locums coverage which required LBH to give them a minimum number of shifts per week. According to LBH, without the requisite minimum number of shifts, neither physician would be willing to provide any coverage at all.

106. Based on such representations from LBH, Dr. Kyere contacted Drs. Robert Reyes and Victor Yu—the two locums doctors retained by LBH to provide locums IR coverage to accommodate his modified work schedule.

107. Both doctors relayed starkly identical information to Dr. Kyere: (1) they were both contacted by Kris Brown, Executive Assistant to Dr. Durand; (2) both doctors were asked to provide "as much coverage as possible"; (3) neither physician was told the coverage need was only two days per week; (4) neither doctor indicated they required a minimum number of shifts in order to provide any coverage; and (5) neither doctor has a written contract with the hospital requiring a minimum number of shifts.

---

[2] In addition to daytime coverage, the department required evening and weekend call coverage for emergency procedures. Pursuant to Dr. Kyere's employment contract, he is required to provide weeknight and weekend call coverage one week per month. When Dr. Kyere obtained a modified work schedule, he did not ask LBH to modify his call responsibilities by obtaining locums IR call coverage, as this would be costly for the hospital.

108. This contradicted Dr. Durand's and Ms. Dorrough's express representations.

109. These facts also clearly evidence the retaliatory nature of LBH's requirement that Dr. Kyere provide diagnostic coverage. In lieu of minimizing highly costly locums/independent contractor IR coverage, Dr. Durand solicited such coverage and relegated Dr. Kyere to diagnostic responsibilities, despite Dr. Kyere's employment contract and objections to such assignments.

110. Dr. Durand was personally aware that Dr. Kyere left his prior employment and rejoined LBH in May 2021 because his prior employer needed diagnostic coverage from IR physicians and Dr. Kyere did not want diagnostic radiology responsibilities.

111. Even assuming Dr. Kyere was being relegated to diagnostic coverage because of some shortage of diagnostic radiology coverage, it would have been cheaper for LBH to obtain locums diagnostic coverage than locums interventional radiology coverage.

112. It was now unequivocally clear that Dr. Kyere's diagnostic coverage assignment had nothing to do with the "scheduling needs of the department" and everything to do with retaliating against Dr. Kyere for engaging in a protected activity by obtaining a modified schedule as a reasonable accommodation.

113. On May 16, 2022, Dr. Kyere's attorneys informed LBH that he "will not provide any additional diagnostic coverage effective immediately."

114. On May 24, 2022, without disputing any of the information that Dr. Kyere learned from Drs. Yu and Reyes, LBH replied insisting that Department "staffing is being arranged to support the business needs of the department" and that LBH did not "have an IR role available" for Dr. Kyere, despite his position as the Medical Director of the Department, "given current staffing arrangements."

115. LBH's solution to this contrived dilemma was that "if the business needs of the department on a particular day demonstrate a need for Dr. Kyere to provide diagnostic coverage and he does not wish to do so, he will be permitted to take paid leave, as we previously discussed."

116. Despite the purported "business needs of the department," LBH immediately stopped scheduling Dr. Kyere for diagnostic coverage without any further discussion.

117. On May 12, 2022, the retaliation continued when Dr. Kyere received a letter from Elizabeth Zadzielski, MD, MBA, Chair, Impaired Physician Committee. The letter informed Dr. Kyere that the IPC was "convened on May 6, 2022 to review and discuss concerns regarding progressive changes in gait and mobility that have been referred by Dr. Daniel Durand, Chairman Department of Radiology, to Dr. Omar Zalatimo, President of the Medical Staff per the Sinai Medical Staff Bylaws and IPC policy."

118. According to the letter, after review of "*[o]bservations* from within the Radiology Department and Employee Health, as well as recommendations from Dr. Miriam Alexander's workplace assessment conducted November 23, 2021," the Committee was requiring that Dr. Kyere undergo an "Employee Health Assessment, including random substance testing" and "Evaluation by the Aging Surgeon Program at Sinai Hospital." (Emphasis added.)

119. The IPC cited events from ten and six months prior, during which time Dr. Kyere performed hundreds of complex and invasive procedures without a single adverse patient safety event, as a basis to initiate this inquiry into his health status and ability to perform procedures.

120. According to the Aging Surgeons Program's website, the program was "developed to offer a comprehensive, multidisciplinary, objective and confidential evaluation of physical and cognitive function for surgeons."

121. To undergo evaluation under this program, Dr. Kyere would be required to release five years of medical records and undergo a two-day, intensive medical examination which would include a general physical exam, hearing screen, neurology exam, physical/occupational evaluation, neuropsychology exam, and ophthalmological examination.

122. Enclosed with the letter from the IPC were also health forms Dr. Kyere was required to complete and submit no later than May 20, 2022.

123. These forms sought information not only about Dr. Kyere's health but his family's health, including parents and siblings. It required he disclose whether his parents were living or deceased, their highest level of education, whether they had learning disabilities, whether they had any neurological diseases such as Alzheimer's or Parkinson's disease, whether they suffered from any other diseases such as heart disease or diabetes, whether they suffered from any psychiatric illness or other conditions, such as intellectual disabilities or learning problems, or used illicit drugs or suffered from alcohol abuse.

124. With respect to Dr. Kyere's health, he was required to disclose any "medical problems that you had prior to the onset of your current condition" such as diabetes, heart disease, exposure to toxins, any hospitalizations, and Dr. Kyere's psychiatric history such as whether he had ever suffered from depressive or anxiety disorders, and whether he had ever had psychotherapy, counseling, or psychiatric care. He was also required to disclose whether he was "experiencing any problems" related to his "marriage/family," "financial/legal (e.g., are you currently involved in a personal injury or criminal legal case)," or "housekeeping/money management."

125. The Committee's request was directed by Dr. Durand as a retaliatory act and aimed at embarrassing and harassing Dr. Kyere and discovering any physical or mental limitations not relevant to his ability to safely perform the essential functions of his job.

126. Based on the letter from the IPC to Dr. Kyere dated May 12, 2022, the Committee convened to address Dr. Kyere's purported "progressive changes in gait and mobility."

127. Yet, the proposed health inquiries and extensive medical examination clearly exceeded any attempts to determine whether his gait or mobility and any purported issues with his dexterity were impacting his ability to safely perform the essential functions of his job.

128. Despite the lack of concerns or allegations relating to his cognitive abilities, the Committee proposed to subject Dr. Kyere to a sweeping medical examination which includes a neurological and neuropsychological evaluation. Although there have never been any concerns about his ability to see or hear, the Committee proposed to have Dr. Kyere undergo a hearing and ophthalmological exam. The Committee also proposed having Dr. Kyere undergo a "general physical examination," presumably aimed at discovering any health issues Dr. Kyere may have, even ones not relevant to whether he can perform the essential functions of his job.

129. In a letter dated May 16, 2022, Dr. Kyere's attorneys quickly requested that LBH reconsider the proposed invasive, overly broad, and unlawful medical examination and requirement to complete attendant health forms.

130. Although the IPC's requests were overly broad and unlawful, Dr. Kyere submitted to a drug and alcohol screening test on May 13, 2022, just one day after receiving the IPC's request to undergo such testing, to dispel any insinuation that he had any substance use or abuse problems.

131. On May 24, 2022, the Committee stated it "was not willing to alter its requests, as it believes the information which will be gathered by the Aging Surgeon Program (a nationally recognized program) is necessary for them to make a determination ***as to whether impairment exists***, as they are required by our Impaired Practitioner Policy, which is being utilized at Dr. Kyere's request." (Emphasis added.)

132. It was clear the Committee was not interested in whether Dr. Kyere could perform the essential functions of his job but in determining ***"whether impairment exists"***—a retaliatory and unlawful endeavor to harass and embarrass Dr. Kyere by compelling him to undergo an invasive health exam.

133. The only relevant and lawful inquiry for the Committee was whether any purported "impairment" impacted Dr. Kyere's ability to perform the essential functions of his job.

134. Dr. Kyere did not have the option to resign during such an investigation, because a resignation under such circumstances would be immediately reportable to the Maryland Board of Physicians or the National Practitioner Data Bank as required by law.

135. Fearing a reporting to the Maryland Board of Physicians or the National Practitioner Data Bank, which could take years to resolve and compromise his ability to obtain new employment, Dr. Kyere attempted to negotiate with the LBH and the IPC by offering: (1)

all medical records that pertain to lab and imaging studies taken during the past five years; (2) a letter from his treating neurologist stating she is aware of his job and that based on her medical judgment, Dr. Kyere could perform all the essential functions of his job with a reasonable accommodation; and (3) agreement to submit to portions of the Aging Surgeons Program pertaining to an evaluation of his dexterity and cognitive abilities—the only portions relevant to determining whether he could perform the essential functions of his job.

136. In an email dated June 3, 2022, without addressing Dr. Kyere's suggestions on the merits, LBH refused to retreat from its unlawful and retaliatory demands and instead demanded he undergo the medical examination by July 1, 2022.

137. On June 6, 2022, Dr. Kyere initiated the process to file a Charge of Discrimination with EEOC.

138. At this time, LBH represented that Dr. Kyere was "currently in breach of his employment agreement due to his repeated, willful refusal to comply with the reasonable request of the committee. Remedies for his failure to complete the requested evaluation by July 1, 2022 include termination of employment."

139. Knowing he would be reported to the Maryland Board of Physicians for being terminated during such an investigation—even if the investigation is baseless, discriminatory, and retaliatory—Dr. Kyere had no choice but to complete the health forms to begin the medical evaluation through the Aging Surgeons Program.

140. On June 12, 2022, Dr. Kyere completed portions of the health forms which, in his judgment, were adequate to assess his clinical competence and ability to perform the essential functions of his job and, to some extent, protected his right to be free from unlawful medical inquiries, and submitted them to S. Jasmine Demos, Clinical Program Coordinator for the Aging Surgeon Program.

141. On June 13, 2022, Ms. Demos requested Dr. Kyere "go over the forms and fill out any blank areas," and "indicate when I will be receiving your prior medical records of 5 years back including lab findings and LSpine. MRI you indicated had been completed in 12/21." She also informed Dr. Kyere that the health forms "are not elective but mandatory to be filled out by participating physician."

142. In addition to the health forms, LBH and IPC also wanted Dr. Kyere to sign a "Release Form" releasing the Hospital and the doctors and providers from "any and all grievances, claims, demands, debts, defenses, actions or cause of action, obligations, damages and liabilities whatsoever which she now has, or has had, known or unknown, whether the same be at law, in equity, or mixed, in any way arising from or relating to the services provided, and the reports generated, pursuant to the testing agreement between Sinai and the person or institution who contracted for the evaluation."

143. After Dr. Kyere refused to sign the sweeping Release Form, citing his belief that he already had claims against LBH and potentially the IPC members, there were no further requests from LBH, the IPC, or the Aging Surgeons Program to complete any health forms or schedule any medical evaluation.

144. On July 21, 2022, LBH agreed not to make Dr. Kyere undergo any medical evaluation through the Aging Surgeon Program. Instead, the IPC now proposed Dr. Kyere undergo a medical evaluation by a Neurologist and an Ophthalmologist and undergo a "functional capacity evaluation."

145. After months of being subjected to these retaliatory actions, Dr. Kyere was completely exhausted, and the stress of these events were taking a toll on his health, family, and general wellbeing.

146. Since April 1, 2022, Dr. Kyere had been working under heightened scrutiny and caution which was not good for Dr. Kyere or his patients. Dr. Kyere was treating each patient utilizing not only his medical and clinical judgment but also with consideration of the pending allegations against him. Dr. Kyere would frequently stay up each night contemplating each case he had done the day or even weeks before, wondering if LBH would use some clinical judgment he made to make further allegations about whether he was a threat to patient safety. Almost daily, he spent his evenings after work checking medical records and imaging to ensure there was no basis to make any allegations concerning his clinical competence or ability.

147. Meanwhile, Dr. Kyere watched the comparator physician, who was a real threat to patient safety, continue to practice without any oversight.

148. The new, and much more limited, request for medical evaluation was further proof that LBH and the IPC had no genuine concerns about Dr. Kyere's ability to provide safe patient care and the previously proposed medical evaluation was not only unwarranted and unnecessary but proposed without any legitimate basis and in bad faith.

149. LBH went from only requesting an observation to requesting an invasive, retaliatory, and unlawful two-day medical examination and production of his medical records for prior years to asking Dr. Kyere to be evaluated by a neurologist, ophthalmologist, and undergo a "functional capacity evaluation."

150. On August 1, 2022, Dr. Kyere's attorneys sent a final letter to LBH restating, yet again, his legal position, and requesting a meeting with LBH counsel to discuss "final resolution of this matter."

151. After receiving this letter, it was LBH's immediate position that the employment relationship had become irreparable, and it desired to terminate the employment relationship and begin immediately to advertise his position.

152. In follow-up discussion on August 2, 2022, Dr. Kyere's attorneys spoke to LBH counsel regarding final resolution of all issues. Dr. Kyere's attorneys conveyed the unhealthy

working relationship between Dr. Kyere and Dr. Durand, the financial and emotional toll the past five months have had on Dr. Kyere as well as his family, and that he could no longer proceed under the status quo.

153. During this follow-up discussion, LBH reiterated that the employment relationship had become so "irreparable" that it sought to terminate Dr. Kyere's employment. LBH also conveyed that any separation agreement must include a release by Dr. Kyere of all claims against it and its employees and agents. LBH also stated its desire to advertise Dr. Kyere's position immediately.

154. During this conversation, Dr. Kyere's attorneys informed LBH that Dr. Kyere would consider a separation agreement if LBH was not willing to close the IPC investigation and permit him to complete the remainder term of his contract.

155. Dr. Kyere's employment contract did not permit LBH to terminate Dr. Kyere without cause.

156. On August 3, 2022, LBH inquired with Dr. Kyere's attorneys what "terms of separation" he would find acceptable.

157. Dr. Kyere's attorneys proposed several terms of separation for consideration by LBH: (1) close the IPC investigation and permit him to complete the remainder of his contract term; (2) close the IPC investigation and permit him to resign and pay him $600,000 for release of all claims against LBH and any of its employees or agents; or (3) close the IPC investigation and permit him to resign without any release of any claims against LBH or any of its employees or agents.

158. After considering Dr. Kyere's proposed terms for separation, LBH informed Dr. Kyere that it has elected to terminate Dr. Kyere for failure to undergo the overly broad and unlawful medical examination required by the IPC if he did not resign.

159. Under threat of termination and fearing he would be reported to the Maryland Board of Physicians and the National Practitioner Databank if he was terminated during the IPC investigation, Dr. Kyere negotiated a formal separation agreement where if he resigned, LBH would agree to close the IPC investigation and not report him to any licensing authority or the National Practitioner Databank for resigning during a peer review investigation. Such reporting is required under federal law and the Maryland Health Occupations Code.

160. Knowing there was absolutely no basis for the IPC investigation, that Dr. Kyere had not had a single adverse patient safety event despite performing thousands of procedures throughout his employment with LBH, that there was no objective evidence suggesting Dr. Kyere could not provide safe and effective patient care despite his disability, LBH entered into a quid pro quo agreement with Dr. Kyere whereby it would close the IPC investigation in order to allow Dr. Kyere to resign.

161. LBH's willingness to enter this quid pro quo agreement permitted Dr. Kyere to resign without being reported to the Maryland Board of Physicians or the National Practitioner Data Bank and preserve his career and professional reputation.

162. LBH was aware that the express terms of Dr. Kyere's employment agreement did not permit LBH to terminate him without cause. LBH also knew that Dr. Kyere's refusal to undergo the overly broad and unlawful medical examination proposed by the IPC was not a legitimate basis to terminate his contract. Based on this, LBH determined the only way to compel Dr. Kyere to resign is to enter into such a quid pro quo agreement whereby the sham IPC investigation would be closed and Dr. Kyere would resign with assurance that he would not be reported to the Maryland Board of Physicians or the National Practitioner Data Bank.

163. Ultimately Dr. Kyere entered into a quid pro quo separation agreement which expressly provided that the IPC investigation was closed, Dr. Kyere would voluntarily resign his clinical privileges at Sinai Hospital without any right to appeal under the Medical Staff Bylaws, and there would be no reporting to the Maryland Board of Physicians or the National Practitioner Data Bank concerning the IPC investigation or his resignation.

164. This separation agreement did not require Dr. Kyere to release any claims against LBH or its employees and agents.

165. In accordance with the quid pro quo separation agreement, Dr. Kyere was constructively discharged from his employment effective September 15, 2022.

## COUNT I: DISCRIMINATION BASED ON ACTUAL AND REGARDED AS DISABILITY AGAINST LBH AND ALL DEFENDANTS INDIVIDUALLY AND IN THEIR PERSONAL CAPACITY

166. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 165 as if fully set forth herein.

167. At all times relevant hereto, Dr. Kyere was a qualified individual with a disability.

168. Beginning in at least 2020, LBH was aware of Dr. Kyere's apparent disability as manifested by an abnormal gait.

169. Despite his disability, Dr. Kyere exhibited superior skill and expertise in his specialty as an Interventional Radiologist.

170. Throughout his employment with LBH, Dr. Kyere exceeded all legitimate expectations of his employer.

171. Prior to March 1, 2022, when Dr. Kyere made a formal request for a reasonable accommodation based on his disability, LBH had never taken any corrective action or other adverse employment action against Dr. Kyere. To the contrary, LBH was pleased with his

performance, promoted him to various positions several times throughout his employment, and relied on his skills and expertise in the field of Interventional Radiology.

172. Prior to March 1, 2022, when Dr. Kyere made a formal request for a reasonable accommodation based on his disability, LBH had never questioned whether Dr. Kyere's health condition, which LBH was aware manifested as an abnormal gait for years, impacted his ability to provide safe and effective patient care.

173. After Dr. Kyere made a request for a reasonable accommodation based on his disability, however, LBH began to discriminate against Dr. Kyere and treated him less favorably than other comparator Interventional Radiologists in the Department.

174. LBH treated Dr. Kyere less favorably than other comparator Interventional Radiologists in the Department although he could perform all essential functions of his job with a reasonable accommodation.

175. The very day that LBH agreed to provide Dr. Kyere a reasonable accommodation based on his disability, LBH demanded that the Dr. Kyere prove he can perform his job by undergoing an observation by an outside physician who practices in the same specialty—a practice not protected as confidential medical review under Maryland law or recognized as a means of assessing his abilities under the medical staff bylaws and attendant policies and procedures or his employment agreement.

176. LBH also began making negative aspersions about whether Dr. Kyere was a safe practitioner because of his disability. These negative aspersions concerning his ability to provide safe patient care were made to individuals throughout the Department, including staff that worked with Dr. Kyere daily.

177. These negative aspersions about Dr. Kyere's clinical abilities were completely unfounded and refuted by all objective evidence such as Dr. Kyere's ability to perform complicated procedures deferred to him by his colleagues, his almost nonexistent complication rate as determined by Dr. Durand, and lack of a single adverse patient safety event related to Dr. Kyere.

178. When Dr. Kyere refused to agree to an observation by an outside physician practicing in his specialty, LBH opened a formal investigation into Dr. Kyere's health by convening the IPC to obtain and scrutinize his sensitive personal health information and make a determination as to whether he is able to perform procedures on patients, although there was absolutely no objective evidence suggesting that he could not.

179. Although Dr. Kyere's health condition manifested in an abnormal gait, LBH now alleged, and reported to the IPC, that Dr. Kyere also had issues with his dexterity despite Dr. Kyere's categorical denial of having any issues with dexterity and his ability to continue to perform hundreds of highly complex procedures without a single adverse patient safety event.

180. After being convened, the IPC members refused to act with any objectivity in evaluating any allegations that Dr. Kyere's disability impacted his ability to provide safe patient care. Instead, at all times relevant hereto, the IPC members acted with discriminatory animus motivated by Dr. Kyere's disability, and refused, in bad faith, to review existing patient care data pertaining to Dr. Kyere which would have categorically dispelled any notion that Dr. Kyere's disability has any impact on his ability to provide safe patient care.

181. Under Maryland law, members of the IPC are not entitled to immunity from personal civil liability as the IPC did not satisfy the requirements of a peer review committee and, even if it did, members of the IPC did not "act[] in good faith and within the scope of the jurisdiction of a medical review committee." Md. Code Ann., Cts. & Jud. Proc. § 5-637.

182. The purported unverified and undocumented "report" of a dexterity issue made by an ultrasound technician was dispelled by Dr. Kyere's complication rate and two Interventional Radiology technicians' statements to LBH that they had no reason to believe that Dr. Kyere was unable to perform procedures or was a threat to patient safety based on their observation of Dr. Kyere during all his procedures.

183. It was apparent that LBH and individual IPC members regarded Dr. Kyere as having a substantially limiting impairment with respect to his dexterity when, in fact, Dr. Kyere had no such impairment.

184. It was also apparent that LBH was using the myths, fears, and stereotypes pertaining to persons with disabilities to make assumptions about Dr. Kyere's dexterity merely because he had a health condition which manifested as an abnormal gait. These stereotypic assumptions about persons with disabilities resulted in negative assumptions about Dr. Kyere's dexterity despite the lack of any legitimate and credible basis to believe Dr. Kyere has any issues with dexterity.

185. Despite another comparator physician in the Department who experienced frequent rare and serious complications while treating patients, LBH elected to initiate an investigation into Dr. Kyere's abilities to provide safe patient care while taking no action against the comparator physician, clearly evidencing its discriminatory animus towards Dr. Kyere.

186. Despite LBH's and IPC's purported "concerns" about whether Dr. Kyere can safely perform the essential functions of his job and Medical Staff Bylaws and Maryland Health Occupations Code provisions which permit—and even require—the hospital to summarily suspend his clinical privileges pending an investigation of his fitness to practice medicine, neither LBH nor IPC took action to limit or suspend Dr. Kyere's clinical privileges and permitted him to continue to treat patients.

187. After LBH referred Dr. Kyere to the IPC for an investigation, Dr. Kyere performed more than 200 procedures without a single adverse patient safety event.

188. LBH was aware that the express terms of Dr. Kyere's employment agreement did not permit LBH to terminate him without cause. LBH determined the only way to compel Dr.

Kyere to resign or enter into a "mutual" separation agreement was to threaten his termination based on his failure to undergo the overly broad and unlawful medical examination required by the IPC if he did not resign.

189. Under threat of termination during the IPC investigation which would trigger reporting to the Maryland Board of Physicians and the National Practitioner Data Bank as required under federal and state law, Dr. Kyere agreed to enter into a quid pro quo separation agreement proposed by LBH.

190. LBH's threat to terminate Dr. Kyere for his failure to undergo the overly broad and unlawful medical examination was pretextual for its discriminatory and retaliatory ambition to discharge Dr. Kyere from employment because of his disability, actual and perceived.

191. LBH's willingness to enter into a quid pro quo agreement to close the IPC investigation in exchange for Dr. Kyere's resignation also evidences its discriminatory and retaliatory ambition to discharge Dr. Kyere from employment because of his disability, actual and perceived.

192. Knowing there was absolutely no basis for the IPC investigation, that Dr. Kyere had not had a single adverse patient safety event despite performing thousands of procedures throughout his employment with LBH, that there was no objective evidence suggesting Dr. Kyere could not provide safe and effective patient care despite his disability, LBH proposed a quid pro quo agreement with Dr. Kyere whereby it would close the IPC investigation in exchange for his resignation.

193. This separation agreement did not require Dr. Kyere to release any claims against LBH or its employees and agents.

194. In accordance with the quid pro quo separation agreement, Dr. Kyere was constructively discharged from his employment effective September 15, 2022.

195. All of LBH and the IPC's discriminatory actions taken against Dr. Kyere were motivated by his disability causing Dr. Kyere to suffer emotional distress, humiliation, pain, suffering, and economic harm, including lost wages.

196. LBH's actions were wanton, reckless, and done in willful disregard of Dr. Kyere's legal rights and with malice.

## COUNT II: HARASSMENT BASED ON DISABILITY AGAINST LBH AND ALL DEFENDANTS INDIVIDUALLY AND IN THEIR PERSONAL CAPACITY

197. Plaintiff adopts and incorporates the foregoing allegations in paragraphs 1 through 196 as if fully set forth herein.

198. At all times relevant to this Complaint, Dr. Kyere was an employee of LBH and a member

of the Sinai Medical Staff.

199. At all times relevant to this Complaint, Dr. Kyere was a qualified person with a disability under the State Government Article of the Annotated Code of Maryland.

200. As described in the preceding paragraphs, Dr. Kyere was subjected to a hostile work environment in the form of undue scrutiny of his work and initiation of an investigation into his ability to provide safe patient care despite the absence of even a scintilla of evidence suggesting his disability had any impact on his ability to provide safe patient care.

201. After initiating this unwarranted and unlawful investigation into Dr. Kyere, LBH and the IPC demanded that Dr. Kyere undergo an unlawful and overly broad medical exam despite his refusal and insistence that such a medical examination was discriminatory and a violation of his federal and state protected rights.

202. After being convened, the IPC members refused to act with any objectivity in evaluating any allegations that Dr. Kyere's disability impacted his ability to provide safe patient care and harassed Dr. Kyere by demanding he submit to an overly broad and unlawful medical examination.

203. At all times relevant hereto, the IPC members' insistence, in bad faith, that Dr. Kyere submit to an overly broad and unlawful medical examination despite the existence of abundant existing patient care data pertaining to Dr. Kyere which categorically dispelled any notion that Dr. Kyere's disability has any impact on his ability to provide safe patient care constitutes severe and pervasive harassment under the State Government Article.

204. Under Maryland law, members of the IPC are not entitled to immunity from personal civil liability as the IPC did not satisfy the requirements of a peer review committee and, even if it did, members of the IPC did not "act[] in good faith and within the scope of the jurisdiction of a medical review committee." Md. Code Ann., Cts. & Jud. Proc. § 5-637.

205. This demand for an unlawful medical examination required Dr. Kyere to disclose five years of medical records containing sensitive and private health information as well as irrelevant information about his family's health, his marriage, personal finances, and other information having nothing to do with his ability to perform the essential functions of his job.

206. LBH and IPC's demand that Dr. Kyere undergo an unlawful and overly broad medical examination was motivated not by a business necessity but purely based on his disability and a desire to demean, humiliate, and harass him so as to compel his resignation.

207. LBH's counsel expressly denied that the initiation of this investigation and demands for medical evaluation, were a medical review action under the Health Occupations Code or the federal Healthcare Quality Improvement Act of 1986. Such actions would have provided Dr. Kyere with rights to a fair hearing while subjecting him to reporting to the Maryland Board of Physicians and the National Practitioner Data Bank, which could have

compromised the future of his medical license and, indeed, his entire career. Dr. Kyere was never provided with any notice of any hearing rights or intent to take actions regarding his clinical privileges, further establishing that LBH and the IPC were not motivated by legitimate patient concerns.

208. The conduct alleged in the preceding paragraphs was unwelcome.

209. LBH and all members of the IPC were aware that the conduct was unwelcome.

210. The discriminatory and unlawful actions of LBH and the IPC taken toward Dr. Kyere were sufficiently severe and pervasive so as to create an intimidating, hostile, and offensive work environment which impacted Dr. Kyere's ability to perform his job.

211. The relentless harassment, discriminatory conduct directed at him, and pendency of the IPC investigation, which could lead to the restriction or revocation of his medical privileges or reporting to a licensing authority, caused Dr. Kyere to work under heightened scrutiny and caution. Dr. Kyere constantly feared that any medical complication resulting from a procedure he performed, whether a common or known complication of the procedure, would be used to bolster false allegations that his disability prevented him from providing safe and skilled patient care.

212. Based on fears about further allegations being lodged against him, Dr. Kyere became hyper cautious about accepting cases or patients he could refer to another provider or specialty outside the Department altogether. Whereas Dr. Kyere had sought out difficult and challenging patient care cases which he successfully performed throughout his employment with LBH, Dr. Kyere referred such cases whenever another provider could perform the procedure without detriment to the patient. Despite his ability to perform more cases as a result of the rest and Physical Therapy he was obtaining due to his modified work schedule, Dr. Kyere made a conscious decision to do less patient care cases to minimize any risk of further allegations.

213. Every day that the IPC investigation continued to remain open and LBH and the IPC demanded he undergo an unlawful and unwarranted medical examination without any justification or legitimate business necessity, Dr. Kyere lived with the fear of losing a livelihood he loved and took more than two decades to train for.

214. As a consequence of Defendants' unlawful and discriminatory conduct taken toward Dr. Kyere which was purely motivated by his disability, Dr. Kyere suffered emotional distress, humiliation, pain and suffering, harm to his professional reputation, and economic loss, including lost wages.

215. This Count states a claim of harassment pursuant to Md. Code Ann., Stat Gov't §20-606.

**COUNT III: UNLAWFUL MEDICAL INQUIRY AND MEDICAL EXAMINATION IN VIOLATION OF STATE GOVERNMENT ARTICLE AND CODE OF MARYLAND REGULATIONS (COMAR) AGAINST LBH AND ALL DEFENDANTS INDIVIDUALLY AND IN THEIR PERSONAL CAPACITY**

216. Plaintiff adopts and incorporates the foregoing allegations in paragraphs 1 through 215 as if fully set forth herein.

217. On May 12, 2022, Dr. Kyere received a letter from the IPC, requiring that he submit to an overly broad and unlawful two-day medical examination which included a neurological and neuropsychological evaluation, a general physical exam, hearing exam, physical/occupational evaluation, and ophthalmological examination, as well as disclosure of sensitive medical and personal information about himself and his family, as well as submit to substance testing by providing a urine specimen.

218. Based on the letter from the IPC to Dr. Kyere the Committee was convened to address Dr. Kyere's purported "progressive changes in gait and mobility."

219. Yet, the proposed health inquiries and extensive medical examination clearly exceeded any attempts to determine whether his gait or mobility or any purported issues with his dexterity were impacting his ability to safely perform the essential functions of his job.

220. Despite the lack of concerns or allegations relating to his cognitive abilities, the Committee proposed to subject Dr. Kyere to a sweeping medical examination which included a neurological and neuropsychological evaluation. Although there have never been any concerns about his ability to see or hear, the Committee proposed to have Dr. Kyere undergo a hearing and ophthalmological exam. The Committee also proposed having Dr. Kyere undergo a "general physical examination," presumably aimed at discovering any health issues Dr. Kyere may have, even ones not relevant to whether he can perform the essential functions of his job.

221. To undergo the requisite medical examination proposed by the IPC, Dr. Kyere would also be required to release five years of medical records.

222. Enclosed with the letter from the IPC were also health forms Dr. Kyere was required to complete and submit no later than May 20, 2022 seeking information about his family's health, including parents and siblings.

223. With respect to Dr. Kyere's health, he was required to disclose any "medical problems that you had prior to the onset of your current condition" such as diabetes, heart disease, exposure to toxins, any hospitalizations, and Dr. Kyere's psychiatric history, such as whether he had ever suffered from depressive or anxiety disorders and whether he had ever had psychotherapy, counseling, or psychiatric care. He was also required to disclose whether he was "experiencing any problems" related to his "marriage/family,"

"financial/legal (e.g., are you currently involved in a personal injury or criminal legal case)," or "housekeeping/money management."

224. Under the State Government Article, "[a]n employer may not: (1) fail or refuse to hire, discharge, ***or otherwise discriminate*** against any individual with respect to the individual's compensation, ***terms, conditions, or privileges of employment*** because of: (i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or ***disability*** unrelated in nature and extent so as to reasonably preclude the performance of the employment." Md. Code Ann., State Gov't § 20-606 (emphasis added).

225. Pursuant to COMAR provisions, "A covered entity may not. . .[f]ail to make an ***individualized assessment*** of a qualified individual with a disability's ***ability to perform the essential functions of a job***." Md. Code Regs. 14.03.02.04.

226. Therefore, State Government Article and attendant COMAR provisions require that any medical examination, which is an individualized assessment of an employee, must be solely related to his/her ability to perform the essential functions of a job.

227. Based on COMAR, a disability-related inquiry or medical examination of an employee with or without a purported disability must be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's ability to perform the essential functions of the job.

228. COMAR provisions require that any proposed medical examination or inquiry must be limited to an assessment of potential impairments that originally necessitated the inquiry or examination.

229. The proposed inquiry and extensive medical examination of Dr. Kyere clearly exceeds any attempts to determine whether Dr. Kyere's gait or mobility and any purported issues with his dexterity are impacting his ability to safely perform the essential functions of his job.

230. The proposed inquiry and extensive medical examination of Dr. Kyere was not job-related or consistent with business necessity.

231. LBH and the IPC demanded that Dr. Kyere undergo an overly broad and unlawful medical inquiry and examination.

232. LBH and IPC's demand that Dr. Kyere undergo an overly broad and unlawful medical inquiry and examination was contrary to Maryland law which requires any licensed hospital to create, adopt and implement a practitioner performance evaluation process. Under such provisions "(i)(1)[a]s a condition of licensure, each hospital shall establish a practitioner performance evaluation process that objectively evaluates the performance of each member of the medical staff at the hospital. (2) The practitioner performance evaluation process shall include a review of care provided to patients at the hospital by the members of the medical staff. (3) The review of care shall: (i) Be undertaken for cases

chosen at random and for cases with unexpected adverse outcomes; (ii) Be based on objective review standards; (iii) Include a review of the appropriateness of the plan of care for the patient, particularly any medical procedures performed on the patient, in relation to the patient's condition; and (iv) Be conducted by members of the medical staff or, at the discretion of the hospital, external reviewers, who: 1. Are of the same specialty as the member of the medical staff under review; 2. Have been trained to perform practitioner performance evaluation; and 3. Are not otherwise associated with the case under review." Md. Code Ann., Health-Gen. § 19-319.

233. As the Medical Director of the Department of Interventional Radiology, Dr. Kyere had performed such practitioner performance evaluation for several Interventional Radiologists in the Department ***at the request of LBH*** throughout his employment.

234. Knowing that a practitioner performance evaluation was the appropriate means to dispel any contrived allegations that Dr. Kyere's disability prohibited him from providing safe patient care, Dr. Kyere invited LBH to do a review of care he provided to any patient at the hospital for any time period. LBH and IPC, however, refused and insisted on the unlawful medical examination.

235. Under Maryland law, members of the IPC are not entitled to immunity from personal civil liability as the IPC did not satisfy the requirements of a peer review committee and, even if it did, members of the IPC did not "act[] in good faith and within the scope of the jurisdiction of a medical review committee." Md. Code Ann., Cts. & Jud. Proc. § 5-637.

236. Despite Dr. Kyere's insistence that LBH and the IPC engage in practitioner performance evaluation required under Maryland law to dispel any contrived allegations that his disability impacted his ability to provide safe patient care and despite LBH's legal obligation to conduct such practitioner performance evaluation, LBH and the known and unknown members of the IPC insisted Dr. Kyere submit to an overly broad and unlawful medical examination.

237. When Dr. Kyere refused to undergo an unlawful medical examination, he was constructively discharged from his employment with LBH.

## COUNT IV: CONSTRUCTIVE DISCHARGE

238. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 237 as if fully set forth herein.

239. Dr. Kyere was employed at Sinai Hospital as a physician in the Department of Radiology, in the Division of Interventional Radiology, and served as the Medical Director of the Division.

240. In October of 2021, Dr. Kyere informed his immediate supervisor, Dr. Durand, that he was experiencing lumbar spine pain which was affecting his gait and he was actively seeking treatment for the condition.

241. Because of his medical condition, on March 1, 2022, Dr. Kyere made a request to Dr. Durand for a reasonable accommodation to the terms of his employment agreement.

242. The reasonable accommodation Dr. Kyere sought was a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician. During his two "off" days, Dr. Kyere would perform tasks that did not require his presence in the hospital.

243. There was immediate resistance from LBH to granting Dr. Kyere's request for a reasonable accommodation. First, Dr. Durand suggested that Dr. Kyere take leave under the FMLA or that use his PTO to accommodate his reduced schedule, but Dr. Kyere made clear that he sought only a reasonable accommodation, not an extended amount of leave through use of FMLA or PTO.

244. After a month of resisting using PTO or FMLA leave for a modified schedule, Dr. Kyere hired legal counsel and LBH begrudgingly agreed to provide the reasonable accommodation he requested.

245. For the next six months, Dr. Durand and LBH made the conditions of Dr. Kyere's employment unbearable.

246. First, LBH retained an independent Interventional Radiologist to observe Dr. Kyere perform his procedures in response to an undocumented "report" from an ultrasound technician who purportedly reported that Dr. Kyere had "dexterity issues" during a procedure.

247. Next, LBH informed Dr. Kyere that the hospital could conduct a Focused Professional Practice Evaluation, but that their suggested independent observation would be better for Dr. Kyere, because it would be more confidential.

248. Then, instead of memorializing the new terms of Dr. Kyere's employment with respect to his schedule, compensation, and PTO after the reasonable accommodation had been granted, LBH sought to completely alter the terms of Dr. Kyere's employment.

249. After granting him a reasonable accommodation based on his disability, LBH began scheduling Dr. Kyere to provide coverage at Northwest Hospital instead of Sinai Hospital, when, throughout his six years at LBH, his primary practice location was Sinai Hospital.

250. LBH was aware that this would drastically alter the nature of Dr. Kyere's medical practice as it was widely known that Northwest Hospital did not accommodate the same level of complex patient care as Sinai Hospital. In fact, it was routine practice at LBH to transfer patients needing higher level of care from Northwest Hospital to Sinai Hospital, its flagship location with more sophisticated resources and care, including a larger Interventional Suite with better equipment for the practitioner.

251. Prior to March 1, 2022, when Dr. Kyere made his request for a reasonable accommodation, it was always LBH's practice to have its Medical Director practice at Sinai Hospital while only providing nighttime, weekend, or emergency coverage for emergent procedures at Northwest Hospital. In fact, LBH employed another Interventional Radiologist, whom Dr. Kyere supervised, who was hired to work at Northwest Hospital.

252. After he made a request for a reasonable accommodation, LBH also began to compel Dr. Kyere to provide diagnostic radiology coverage in lieu of interventional radiology coverage, which was completely inconsistent with his position as the Medical Director of Interventional Radiology and his employment contract, which only outlined Interventional Radiology duties.

253. Dr. Kyere expressed his opposition to the hospital's discriminatory and retaliatory conduct and, at a meeting on May 6, 2022, Dr. Durand called Dr. Kyere's opposition to such conduct selfish and inappropriate and labeled Dr. Kyere an "obstructionist [who] can't be trusted."

254. LBH's conduct was not limited to attempting to reassign Dr. Kyere to an inferior practice location or different specialty altogether.

255. On May 12, 2022, Dr. Kyere received a letter from the IPC, requiring that he submit to an overly broad and unlawful two-day medical examination which included a neurological and neuropsychological evaluation, a general physical exam, hearing exam, physical/occupational evaluation, and ophthalmological examination, as well as disclosure of sensitive medical and personal information about himself and his family. The letter also requested Dr. Kyere submit to substance testing by providing a urine specimen.

256. LBH's demand for such an overly broad and unlawful medical examination made it evident that LBH wanted to discover and collect any data tending to provide any support to the notion that Dr. Kyere's health was a basis to conclude that he could not provide reliable and safe patient care despite categorical objective evidence proving otherwise.

257. Throughout this unwarranted and unlawful investigation into his health and clinical abilities, and despite his competence, it was clear that any complication or adverse patient safety event, even if Dr. Kyere adhered to standard of care, would be attributed to health condition and disability which LBH would argue was affecting his clinical abilities. This caused Dr. Kyere heightened stress and anxiety during his daily practice of medicine.

258. LBH's investigation and contrived concerns placed Dr. Kyere's medical license in peril as the investigation and any purported findings suggesting his health condition prevented him from practicing medicine safely, whether made in bad faith or despite objective and reliable evidence suggesting otherwise, was reportable to the Maryland Board of Physicians and the National Practitioner Data Bank.

259. For five months, Dr. Kyere was forced to work in an environment where he was subject to be reported to a licensing authority at any moment if he did not consent to an overly broad and unlawful medical exam directed at harassing and embarrassing him.

260. The conduct of LBH was intended to deliberately make Dr. Kyere's working conditions so intolerable that Dr. Kyere would have no choice but to resign.

261. Any reasonable person in Dr. Kyere's position would find such working conditions frightening, stressful, and intolerable.

262. Dr. Kyere did not have the option to simply resign from his position, however, because under Maryland law, a physician who resigns while under investigation is subject to reporting to the Maryland Board of Physicians or the National Practitioner Data Bank.

263. Fearing a reporting to the Maryland Board of Physicians or the National Pracitioner Data Bank, which could take years to resolve and compromise his ability to obtain new employment, Dr. Kyere had to work amicably and in good faith with LBH to convince the hospital that there was no reasonable basis to question his ability to practice medicine with reasonable skill and safety as he had done for the past six years prior to his request for a reasonable accommodation.

264. With such concerns in mind, Dr. Kyere reluctantly attempted to negotiate a limited investigation which would address the alleged concerns of LBH while also protecting his rights guaranteed under federal and state law.

265. To allay the contrived concerns of LBH and bring the investigation to a conclusion, Dr. Kyere agreed to provide LBH: (1) all medical records that pertain to lab and imaging studies taken during the past five years; (2) a letter from Dr. Kyere's treating neurologist stating she is aware of his job and that, based on her medical judgment, Dr. Kyere could perform all the essential functions of his job with a reasonable accommodation; and (3) an agreement to submit to portions of the Aging Surgeons Program pertaining to an evaluation of his dexterity and cognitive abilities.

266. LBH and IPC rejected such a compromise and continued to demand that Dr. Kyere undergo the overly broad and unlawful medical examination through the Aging Surgeons Program.

267. Every reasonable attempt by Dr. Kyere to negotiate a balanced approach which would address the contrived concerns of LBH while also protecting his federally protected rights were unreasonably and in bad faith rebuffed by LBH and the IPC.

268. LBH and the IPC continued to demand an overly broad and unlawful examination although the nature of Dr. Kyere's medical practice as an Interventional Radiologist permitted a post hoc detailed review of all procedures ever performed by Dr. Kyere. LBH has never disputed that it had such means to address any purported concerns it had that Dr. Kyere could not perform all procedures in a safe and competent manner.

269. After investigating Dr. Kyere's charge of discrimination, the EEOC concluded that all objective evidence indicated "[h]ad Respondent evaluated the numerous medical procedures performed by Charging Party and retained by Respondent, it would have observed no issues with Charging Party's work."

270. LBH's refusal to engage in such a post hoc detailed review of all procedures performed by Dr. Kyere proves it was relentless in its demands to compel Dr. Kyere to undergo an overly broad and unlawful medical examination, not to determine his fitness to practice medicine, but to make his working conditions so intolerable that Dr. Kyere would find them unacceptable and resign.

271. Dr. Kyere endured an abusive, stressful, and unreasonable work environment aimed at harassing and embarrassing him for five months.

272. On August 1, 2022, Dr. Kyere informed LBH that it had become "extremely difficult" to "continue to work under these circumstances as this level of scrutiny and insistence on unlawful medical examination has become intolerable." Dr. Kyere reiterated yet again that in the past five months he had "endured many acts of discrimination and retaliation as well as significant stress and financial expense to preserve his reputation and career." Dr. Kyere further explained that "[c]ontinuing to work under this level of scrutiny is not good for [his] personal health, nor that of the patients he cares for."

273. Despite such circumstances, Dr. Kyere proposed a "final resolution of this matter," including, but not limited to, LBH closing the IPC investigation and permitting him to complete the remainder of his contract term.

274. To prevent prospective employers in the small Baltimore medical community from inquiring about why Dr. Kyere separated from employment despite having returned to LBH less than a year prior, Dr. Kyere was willing to work and complete the remainder of his contract term so long as LBH abandoned its unlawful conduct towards him.

275. LBH was aware that per the terms of Dr. Kyere's employment agreement it could not terminate Dr. Kyere without cause. LBH also knew that Dr. Kyere's refusal to undergo the overly broad and unlawful medical examination proposed by the IPC was also not a legitimate basis to terminate his contract. Based on this, LBH determined the only way to compel Dr. Kyere to resign or enter into a quid pro quo separation agreement was to threaten his termination based on his failure to undergo the overly broad and unlawful medical examination required by the IPC if he did not resign.

276. Under threat of termination during the IPC investigation, Dr. Kyere agreed to enter into a quid pro quo separation agreement proposed by LBH.

277. LBH's threat to terminate Dr. Kyere for his failure to undergo the overly broad and unlawful medical examination was pretextual and an attempt to disguise its intent to constructively discharge Dr. Kyere from his employment because of his disability, actual and perceived.

278. Knowing there was absolutely no basis for the IPC investigation, that Dr. Kyere had not had a single adverse patient safety event despite performing thousands of procedures throughout his employment with LBH, and that there was no objective evidence suggesting Dr. Kyere could not provide safe and effective patient care despite his disability, LBH drafted a quid pro quo agreement with Dr. Kyere whereby it would close the IPC investigation in exchange for his resignation.

279. This quid pro quo separation agreement expressly provided that the IPC investigation was closed, Dr. Kyere would voluntarily resign his clinical privileges at Sinai Hospital without any right to appeal under the Medical Staff Bylaws, and there would be no reporting to the Maryland Board of Physicians or the National Practitioner Data Bank concerning the IPC investigation or his resignation.

280. This quid pro quo separation agreement did not require Dr. Kyere to release any claims against LBH or its employees and agents.

281. In accordance with the quid pro quo separation agreement, Dr. Kyere was constructively discharged from his employment effective September 15, 2022.

282. LBH deliberately caused Dr. Kyere's working conditions to become so intolerable that any reasonable person would feel compelled to resign.

283. The constructive termination of Dr. Kyere resulted solely from the conditions of employment that LBH had created or allowed to exist after Dr. Kyere requested a reasonable accommodation for his disability.

284. "It is the policy of the State ... to assure all persons equal opportunity in employment ... regardless of ... disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." *See* Md. Code, State Government § 20-602.

285. The constructive termination of Dr. Kyere, in response to his request for a reasonable accommodation, was unlawful and violates the clear mandate of public policy in Maryland concerning the right to be free from discrimination in employment based on a disability.

## COUNT V: RETALIATION

286. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 285 as if fully set forth herein.

287. Under Maryland law, an employer may not discriminate or retaliate against any of its employees or applicants for employment, an employment agency may not discriminate against any individual, and a labor organization may not discriminate or retaliate against any member or applicant for membership because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." Md. Code Ann., State Gov't § 20-606.

288. Dr. Kyere engaged in a statutorily protected activity by requesting a reasonable accommodation due to a disability.

289. Dr. Kyere also engaged in a statutorily protected activity when he retained legal counsel to obtain a reasonable accommodation based on his disability when LBH failed to grant him such an accommodation for more than a month after he made a request.

290. After Dr. Kyere requested a reasonable accommodation and obtained legal counsel to obtain one, LBH took adverse employment actions against Dr. Kyere that culminated in his constructive discharge effective September 15, 2022.

291. On April 1, 2022, the very same day that LBH agreed to provide Dr. Kyere the reasonable accommodation he had requested, Dr. Durand informed Dr. Kyere that after conferring with legal counsel and hospital leadership there was a consensus to retain an independent Interventional Radiologist not affiliated with the hospital to observe Dr. Kyere performing procedures to ensure Dr. Kyere was not a threat to patient safety.

292. Dr. Durand alleged that this decision was precipitated by a "report" from the lead ultrasound technician that she had observed Dr. Kyere having difficulty with his dexterity during a procedure.

293. This "report," which was made March 3, 2022—more than four weeks prior to the request for an observation—was solely related to subjective observation of Dr. Kyere's physical limitations and not related to any adverse patient safety event or his inability to perform a procedure.

294. Dr. Durand also alleged that the decision to make Dr. Kyere undergo an observation was informed by a previous report from a staff member at Northwest Hospital in December 2020 and a report from Occupational Health in July 2021 that Dr. Kyere "seemed off."

295. Dr. Kyere was informed and questioned about these prior reports, all of which were related to subjective observations of Dr. Kyere's gait.

296. Prior to Dr. Kyere making a request for a reasonable accommodation, these "reports" were never deemed a patient safety risk, or formally investigated, but were dismissed because all reliable and objective evidence indicated Dr. Kyere was a capable and competent clinician who had a health condition which manifested as an abnormal gait.

297. It was only after Dr. Kyere engaged in a protected activity by requesting and obtaining a reasonable accommodation effective April 1, 2022, that these subjective prior observations of his gait became an indication to LBH that he may be a threat to patient safety.

298. Based on LBH's articulated basis for an observation, Dr. Kyere reminded LBH that the nature of his medical practice allows LBH to do a post hoc review of any procedure he had ever performed, including the one which they received a "report" from the ultrasound technician about.

299. The observation requested by LBH is a practice not protected as confidential medical review under Maryland law or recognized as a means of assessing his abilities under the medical staff bylaws and attendant policies and procedures or his employment agreement.

300. On April 19, 2022, Dr. Kyere informed LBH in writing that he would not agree to an observation and requested an "alternative resolution" to this contrived matter.

301. The next day, in further retaliation against Dr. Kyere, LBH informed him that although all scheduled observations had been cancelled, it would report its "concerns" about Dr. Kyere to the President of the Medical Staff, pursuant to Sinai's Impaired Practitioner Policy.

302. In accordance with Sinai's Impaired Practitioner Policy, Dr. Omar Zalatimo, President of the Medical Staff, convened the IPC to investigate the contrived concerns of LBH and Dr. Durand about Dr. Kyere's ability to provide safe and effective patient care.

303. Per the Medical Staff Bylaws, Dr. Durand would sit as a member of the IPC to inform the Committee's decisions.

304. This IPC investigation was a peer review action under state and federal law. LBH and the IPC did not follow the required policy set forth in the Medical Staff Bylaws for conducting peer review matters. This clearly indicates that LBH and the IPC did not, in fact, have any actual concerns regarding Dr. Kyere's ability to safely provide patient care. Yet, LBH and the IPC's actions claim to have concerns about Dr. Kyere's ability to provide patient care, taking actions, lacking any authority under the Medical Staff Bylaws, that could have jeopardized Dr. Kyere's medical license and career.

305. In accordance with the Impaired Practitioner Policy, the IPC was required to "evaluate the concern and, in its sole discretion, may further investigate such matters."

306. Pursuant to the Policy, "[w]ithin 30 days of receipt of the complaint or self-referral," the IPC was required to "recommend to the MEC [Medical Executive Committee] a course of action to be taken with respect to the impaired practitioner" including "taking no action; further investigation; confronting the impaired practitioner informally or formally with an offer of assistance; and/or demanding a change in behavior."

307. In accordance with the Impaired Practitioner Policy, the "IPC shall also make a recommendation to the MEC concerning whether the practitioner should maintain clinical privileges, whether such privileges require modification, or whether such privilege should be suspended or terminated."

308. The IPC never made any recommendations to the MEC to restrict or revoke Dr. Kyere's clinical privileges.

309. The IPC's failure to take any action to restrict Dr. Kyere's clinical privileges proves that there were no genuine concerns about Dr. Kyere's clinical competence or ability to provide safe patient care despite his disability.

310. In lieu of reviewing all relevant information presented to the IPC and making recommendations to the MEC as to whether further action or investigation concerning Dr. Kyere was necessary or making any other recommendations concerning his clinical privileges, the IPC further retaliated against Dr. Kyere by insisting he undergo an unlawful and overly broad medical examination in violation of federal law.

311. Even when Dr. Kyere expressed his opposition to the overly broad and unlawful medical examination without limits on the scope of such examination, the IPC continued to demand that Dr. Kyere undergo the unlawful medical examination over a period of several months without following the clear and express terms of the Impaired Practitioner Policy or informing the MEC of Dr. Kyere's refusal to submit to the overly broad and unlawful medical examination it proposed.

312. Had the IPC had a genuine and legitimate belief that Dr. Kyere's disability either precluded or could have precluded him from providing safe and effective patient care, the IPC would have informed the MEC of Dr. Kyere's refusal to comply with its investigation and made a recommendation concerning whether Dr. Kyere should continue to have clinical privileges at any LBH hospital.

313. Having no genuine or legitimate belief that Dr. Kyere's disability impacted his ability to provide safe patient care, the IPC used its authority and powers under the Medical Staff Bylaws to collude with LBH to retaliate against Dr. Kyere for engaging in a protected activity.

314. After granting Dr. Kyere a modified work schedule, LBH further retaliated against Dr. Kyere by forwarding him an Amended Employment Agreement which unlawfully changed terms and conditions of his employment not related to his new modified schedule, compensation, or PTO merely because he requested and obtained a reasonable accommodation based on his disability.

315. The proposed Amended Employment Agreement unlawfully changed Dr. Kyere's "terms, conditions and privileges of employment."

316. On May 17, 2022, Dr. Kyere informed LBH that although he "is agreeable to the changes to his compensation and PTO, he will not agree to the other changes proposed."

317. LBH's attempt to modify the terms and conditions of Dr. Kyere's employment not related to compensation or PTO, after he obtained a modified work schedule as a reasonable accommodation, was discriminatory and retaliatory.

318. There is a causal link between the protected activity and all the adverse employment actions and retaliation that Dr. Kyere suffered.

319. After April 1, 2022, the daily schedule, over which Dr. Kyere previously had complete autonomy prior to his request for reasonable accommodation, was also now being changed

without his knowledge or consent in retaliation for engaging in a protected activity by obtaining a reasonable accommodation.

320. After April 1, 2022, LBH routinely attempted to relegate Dr. Kyere to providing coverage at Northwest Hospital or assigned him diagnostic radiology coverage duty in violation of his employment agreement as retaliation for engaging in a protected activity.

321. LBH was aware that this would drastically alter the nature of Dr. Kyere's medical practice.

322. Prior to March 1, 2022, when Dr. Kyere made his request for a reasonable accommodation, Dr. Kyere had *never* reported regularly to Northwest Hospital, and it was always LBH's practice to have its Medical Director practice at Sinai Hospital while only providing call coverage from home for nighttime, weekend, or emergent procedures at Northwest Hospital. In fact, LBH employed another full-time Interventional Radiologist whom Dr. Kyere supervised and who worked principally at Northwest Hospital.

323. Dr. Durand began having Dr. Kyere scheduled to provide diagnostic coverage in lieu of interventional radiology coverage even though Dr. Kyere was hired as the Medical Director for Interventional Radiology and his employment contract did not outline any diagnostic radiology responsibilities.

324. Prior to Dr. Kyere's modified work schedule, he almost never provided diagnostic coverage and such coverage was limited to days there was an emergency or a shortage of diagnostic radiologists due to a holiday. Dr. Kyere had never been required to provide diagnostic coverage without giving his consent.

325. After obtaining his modified work schedule, scheduling Dr. Kyere for diagnostic coverage became much more frequent, and even regular.

326. LBH attempted to explain Dr. Kyere's new assignments as necessitated by a legitimate "business need" which Dr. Kyere subsequently confirmed to be untrue and contrived.

327. Dr. Kyere was often scheduled to provide diagnostic coverage while LBH paid for IR locums coverage, which was not economical, as locums physicians are paid two to three times Dr. Kyere's salary to provide coverage. Dr. Kyere was also being asked to provide diagnostic coverage even though there was already adequate diagnostic coverage onsite.

328. In lieu of minimizing highly costly locums/independent contractor IR coverage, Dr. Durand solicited such coverage and relegated Dr. Kyere to diagnostic responsibilities despite Dr. Kyere's employment contract and objections to such assignments.

329. Dr. Durand was also personally aware that Dr. Kyere left his prior employment and rejoined LBH in May 2021 because Dr. Kyere specifically did not want diagnostic responsibilities.

330. Even assuming Dr. Kyere was being relegated to diagnostic coverage because of some shortage of diagnostic radiology coverage, it would have been cheaper for LBH to obtain locums diagnostic coverage than locums interventional radiology coverage.

331. Dr. Kyere's diagnostic coverage assignment had nothing to do with the "scheduling needs of the department" and everything to do with retaliating against Dr. Kyere for engaging in a protected activity by obtaining a modified schedule as a reasonable accommodation.

332. On May 16, 2022, Dr. Kyere's attorneys informed LBH that he "will not provide any additional diagnostic coverage effective immediately."

333. On May 24, 2022, without disputing any of the information Dr. Kyere independently obtained concerning LBH's lack of legitimate need to assign him to diagnostic coverage, LBH insisted that Department "staffing is being arranged to support the business needs of the department" and that LBH did not "have an IR role available" for Dr. Kyere, despite his position as the Medical Director of the Department, "given current staffing arrangements."

334. Despite the purported "business needs of the department," LBH immediately stopped scheduling Dr. Kyere for diagnostic coverage without any further discussion.

335. LBH retaliated against Dr. Kyere for engaging in a protected activity by changing Dr. Kyere's practice location to Northwest Hospital, requiring he provide diagnostic coverage despite the express terms of his contract, attempting to change the terms and conditions of his employment agreement not related to compensation or PTO, and by referring him to the IPC for investigation based on fabricated concerns about his ability to provide safe and effective patient care.

336. There was a causal link between LBH and IPC's retaliatory conduct and Dr. Kyere engaging in a protected activity.

## COUNT VI: TORTIOUS INTERFERENCE BY DR. DANIEL DURAND, INDIVIDUALLY AND IN HIS PERSONAL CAPACITY

337. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 336 as if fully set forth herein.

338. Prior to Dr. Durand's tortious conduct leading to constructive discharge of Dr. Kyere from LBH, Dr. Kyere was employed by LBH under an employment agreement effective June 1, 2021 and continuing through June 30, 2024.

339. Dr. Durand was aware of Dr. Kyere's contract with LBH.

340. Dr. Durand was also aware that Dr. Kyere was a highly skilled and competent Interventional Radiologist who served as Medical Director of the Department of Interventional Radiology for LBH.

341. Throughout Dr. Kyere's employment with LBH, Dr. Durand, recognizing Dr. Kyere's skill as an Interventional Radiologist, promoted Dr. Kyere to many positions including Vice Chief of Radiology, Medical Director of Interventional Radiology, member of the Sinai Hospital Medical Executive Committee, and member of the Sinai Hospital Multi-Disciplinary Peer Review Committee.

342. In September 2020, Dr. Kyere left full-time employment with LBH.

343. In May 2021, just eight months after leaving LBH, Dr. Durand personally recruited Dr. Kyere to return to LBH as the Medical Director of Interventional Radiology for the entire hospital system.

344. Before recruiting Dr. Kyere back to LBH, Dr. Durand had obtained feedback from Dr. Kyere's referring physicians and peers who all gave overwhelming positive feedback and encouraged Dr. Durand and LBH to recruit Dr. Kyere back.

345. At the time Dr. Durand recruited Dr. Kyere back in May 2021, Dr. Durand agreed to give Dr. Kyere a substantial increase in compensation from his previous contract with LBH and offered him other incentives to agree to return.

346. During negotiations of Dr. Kyere's new contract, Dr. Durand stated "[w]e value you as a team member and we sincerely hope you will chose [sic] to return to LifeBridge Health as one of our key physicians and leaders." He assured Dr. Kyere that LBH would "immediately be building a team around you (Devy has 5+ CVs that we will be putting in front of you for purposes of building a team around you)." Based on these representations, and Dr. Durand's evident confidence in his acumen and skill to lead the Department, Dr. Kyere returned to LBH full-time in May 2021.

347. After his return to LBH, Dr. Kyere made a request to Dr. Durand for a reasonable accommodation of a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician.

348. Although Dr. Durand immediately expressly acknowledged LBH's legal duty to provide such a reasonable accommodation, Dr. Durand requested that Dr. Kyere use his PTO and/or FMLA leave in order to accommodate his modified schedule. From the outset, Dr. Durand expressed to Dr. Kyere that he would also not negotiate with LBH a new salary commensurate with his new schedule stating such an endeavor is "not possible." Instead, Dr. Durand proposed Dr. Kyere could negotiate a new salary which would not be 60% of compensation even though he would still be working 60% of his previous schedule.

349. For a full month, Dr. Kyere refused to use PTO or FMLA in order to obtain a modified schedule. When it was evident Dr. Durand would not permit Dr. Kyere to obtain a reasonable accommodation for his health condition under federal or state law, Dr. Kyere retained legal counsel to negotiate such an accommodation.

350. Within 24 hours of contact from Dr. Kyere's attorneys, LBH agreed to provide Dr. Kyere the reasonable accommodation he had been requesting for more than a month.

351. Dr. Durand immediately became incensed that Dr. Kyere engaged legal counsel to negotiate a reasonable accommodation under federal and state law despite his instructions to Dr. Kyere to use his PTO or obtain FMLA leave.

352. On April 1, 2022, the very same day that LBH acquiesced to Dr. Kyere's legal counsel's request to provide him a reasonable accommodation, Dr. Durand informed Dr. Kyere that he had shared concerns with LBH about Dr. Kyere's ability to continue practicing medicine based on a purported "report" from an ultrasound tech that she had observed Dr. Kyere have difficulty with his dexterity during an ultrasound procedure done weeks prior.

353. Based on Dr. Durand's representations to LBH, LBH demanded that Dr. Kyere be observed by an outside physician in his field to ensure he could safely and properly perform the Interventional Radiology procedures he had performed safely thousands of times for years.

354. Despite Dr. Durand's representations to LBH, Dr. Durand was aware that there has never been any credible or verified "report" from any individual that Dr. Kyere has dexterity issues, was unable to perform procedures, or was a risk to patient safety.

355. Dr. Durand was unequivocally aware that any "reports" concerning Dr. Kyere from the Radiology Department were informal conversations about Dr. Kyere's gait, never about his ability to perform procedures safely.

356. Six months prior to Dr. Durand's report to LBH that Dr. Kyere was not a safe practitioner, Dr. Durand himself conducted a quality review of all physicians in the Department of Interventional Radiology and concluded Dr. Kyere had "the lowest complication rate I have ever seen at 0.1% over the past two years."

357. Throughout Dr. Kyere's employment with LBH, Dr. Durand had relied heavily on Dr. Kyere's skill and expertise in Interventional Radiology. Dr. Durand trusted Dr. Kyere to supervise all physicians in the Department, do quality and peer review on all procedures involving any physician in the Department, and lead the Department according to his judgment.

358. Exacerbating the now acrimonious relationship between Dr. Kyere and Dr. Durand, on April 13, 2022—less than two weeks after obtaining a reasonable accommodation—Dr. Kyere opposed Dr. Durand's plan to train and use other Interventional Radiologists in the Department for stroke therapy. Dr. Kyere warned implementing such a plan "exposes the department to liability in case of an adverse event."

359. After Dr. Kyere expressed his opposition, the plan to train and use existing Interventional Radiologists in the Department for stroke treatment was nixed.

360. At the same time, Dr. Kyere also informed LBH that he would not consent to undergo an observation by an outside practitioner as proposed by Dr. Durand.

361. Dr. Durand, in the span of less than a month, had suffered what he perceived as several unforgivable slights from Dr. Kyere as Dr. Kyere was unwilling to blindly follow or abide by his instructions to waive or abandon his statutorily protected rights or consecrate an ill-conceived plan which would risk patient safety and expose practitioners in the Department and the hospital to liability, despite Dr. Durand's insistence.

362. Within days, Dr. Durand submitted a report to the President of the Medical Staff that "progressive changes" in Dr. Kyere's "gait and mobility"—of which he had been aware for years— now warranted an investigation by the Hospital's Impaired Practitioner Policy into whether Dr. Kyere could safely practice medicine.

363. As the basis of such a report, Dr. Durand cited subjective "[o]bservations" of Dr. Kyere's gait, a statement from Occupational Health ten months prior concerning Dr. Kyere which had already been addressed by Dr. Durand, Dr. Alexander, and Matthew Poffenroth, MD, Senior Vice President, Chief Physician Executive of LifeBridge, and a "workplace assessment" conducted by Dr. Alexander more than six months prior to "brainstorm on ways to make the work environment maximally supportive" for Dr. Kyere in the interventional radiology suite while performing procedures. Dr. Durand made no report of any adverse patient safety incidents concerning Dr. Kyere.

364. Based on information Dr. Durand provided to the President of the Medical Staff, the Hospital's IPC was convened to determine whether any course of action was necessary to verify Dr. Kyere was not a threat to patient safety.

365. After the referral to the IPC, Dr. Durand also served as a member of the IPC to inform the decision-making of the IPC.

366. After convening and considering all information provided by Dr. Durand, the IPC required Dr. Kyere to undergo random substance testing and evaluation by the Aging Surgeon Program at Sinai Hospital.

367. Although Dr. Kyere immediately agreed to substance testing, he refused to undergo an overbroad and unlawful medical examination initiated, at the behest of Dr. Durand, to harass and embarrass him.

368. At all times relevant hereto, Dr. Durand was a corporate officer for LBH.

369. As a corporate officer, Dr. Durand acted contrary to the best interest of LBH to retain a skilled physician and induced LBH to breach its contract with Dr. Kyere, subjecting it to legal liability to vindicate his personal animus towards Dr. Kyere.

370. Dr. Durand's actions were also knowingly and willfully perpetuated with the intentional and improper purpose of causing damage to Dr. Kyere and were without any justifiable cause.

371. All of Dr. Durand's conduct towards Dr. Kyere after April 1, 2022 was also outside the scope of his employment with LBH and was motivated solely by personal animus towards Dr. Kyere and departed from furthering LBH's business in operating acute care medical facilities requiring the skill and expertise of highly specialized physicians such as Dr. Kyere.

372. Dr. Durand, improperly and without any justification, induced LBH to breach its contract with Dr. Kyere, violate state and federal statutes protecting persons with disabilities, and constructively discharge him from his employment in September 2022.

373. As a result of the conduct of Dr. Durand, Dr. Kyere has suffered and will continue to suffer tangible damages, including harm to his professional reputation.

## COUNT VII: BREACH OF CONTRACT—EMPLOYMENT AGREEMENT

374. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 373 as if fully set forth herein.

375. Dr. Kyere was employed by LBH under an employment agreement effective June 1, 2021 and continuing through June 30, 2024.

376. Pursuant to Dr. Kyere's employment agreement, neither LBH or Dr. Kyere had a "unilateral right to terminate this LOA [Letter of Agreement] without cause."

377. The Agreement provided LBH the authority to terminate the contract for cause only for the following reasons: (1) "the loss, limitation, or suspension (other than temporary suspensions lasting five days or less for delinquent medical records) of the physician's clinical privileges at the Hospital or any of the other institution named in the Letter of Agreement for any reason, or at any other health care institution for reasons relating to patient care"; (2) "the physician's provision of services (administrative or clinical) while under the influence of alcohol, drugs, or other mood-altering substances in contravention of standards of good medical practice or Hospital rules or policy, or the physician's commission of any other act that materially violates the Professional Standards subsection of this document"; (3) "the physician's repeated, willful failure to follow the reasonable instructions of the Chief or other individual with the authority to direct the physician's activities"; (4) "censure of, or the imposition of any other disciplinary action against, the physician by any professional medical board, institution, organization, or professional society having any privilege or right to pass upon the physician's conduct"; (5) "the physician becomes uninsurable for professional liability insurance at standard rates; (6) "the loss, limitation, or suspension of any of the physician's professional licenses or board certifications or of the physician's right to practice medicine or to participate in Medicare or the Maryland Medicaid program"; (7) "the physician's conviction of a crime, other than

a minor traffic violation"; or (8) "other serious misconduct by the physician that the Hospital determines poses a threat to the health or safety of Hospital patients, staff, or visitors or the orderly operation of the Hospital, such as theft, abuse, any type of harassment, violent behavior or threat of violence, or similar acts."

378. On March 1, 2022, Dr. Kyere made a request to Dr. Durand for a reasonable accommodation of a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician. During his two "off" days, Dr. Kyere would perform tasks that did not require his presence in the hospital.

379. When LBH delayed a month to grant such a reasonable accommodation, Dr. Kyere retained legal counsel to assist him with obtaining the reasonable accommodation as required under federal and state law.

380. On April 1, 2022—one day after Dr. Kyere's counsel contacted counsel for LBH to engage in the interactive process for purposes of obtaining a reasonable accommodation for Dr. Kyere—LBH informed Dr. Kyere's legal counsel that it would grant him the reasonable accommodation he requested effective immediately.

381. Subsequently, however, LBH breached the terms of his employment agreement by attempting to alter the terms and conditions of various provisions of his employment agreement not related to his new modified schedule and commensurate salary.

382. LBH was aware that this would drastically alter the nature of Dr. Kyere's medical practice as it was widely known that Northwest Hospital did not accommodate the same level of complex patient care as Sinai Hospital.

383. Prior to March 1, 2022, when Dr. Kyere made his request for a reasonable accommodation, Dr. Kyere had *never* reported regularly to Northwest Hospital and it was always LBH's practice to have its Medical Director practice at Sinai Hospital while only providing call coverage from home for nighttime, weekend, or emergent procedures at Northwest Hospital. In fact, LBH employed another full-time Interventional Radiologist whom Dr. Kyere supervised and who worked principally at Northwest Hospital.

384. After Dr. Kyere made a request for a reasonable accommodation as guaranteed to him under federal and state law, LBH also began to compel Dr. Kyere to provide diagnostic radiology coverage in lieu of interventional radiology coverage, which was completely inconsistent with his position as the Medical Director of Interventional Radiology and his employment contract, which only outlined Interventional Radiology duties.

385. LBH's breach of Dr. Kyere's employment agreement was not limited to attempting to reassign Dr. Kyere to an inferior practice location or different specialty altogether.

386. On May 12, 2022, Dr. Kyere received a letter from the IPC requiring that he submit to an invasive and overly broad and unlawful two-day medical examination which included random substance testing, a neurological and neuropsychological evaluation, a general physical exam, hearing exam, physical/occupational evaluation, and ophthalmological

examination, as well as disclosure of sensitive medical and personal information about himself and his family.

387. LBH and IPC's demand for such an overly broad and unlawful medical examination of Dr. Kyere made it evident that LBH wanted to discover and collect any data tending to provide any support to the notion that Dr. Kyere's health was a basis to conclude that he could not provide reliable and safe patient care despite categorical objective evidence proving otherwise.

388. LBH and IPC's demand for such an overly broad and unlawful medical examination of Dr. Kyere made it evident that LBH was acting in bad faith and in breach of his employment agreement to induce Dr. Kyere to resign from his position and terminate his employment contract.

389. For five months, Dr. Kyere expressed his opposition to the hospital's discriminatory and retaliatory conduct.

390. LBH was in breach of Dr. Kyere's contract when it attempted to change the terms and conditions of his employment solely because Dr. Kyere exercised his rights under federal and state law to obtain a reasonable accommodation.

391. Under Maryland contract law, in every contract there also exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the other.

392. Maryland contract law also requires that the implied covenant of good faith governs the manner in which a party to a contract may exercise the discretion accorded to it by the terms of the agreement. Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing.

393. Under the employment contract with Dr. Kyere, LBH was afforded discretion to ensure that Dr. Kyere would practice medicine with reasonable skill and safety. After Dr. Kyere obtained a reasonable accommodation in accordance with his statutorily protected rights under federal and state law, LBH breached the employment agreement by exercising that discretion to demean and harass Dr. Kyere and make it impossible for him to continue to perform under the contract.

394. By attempting to change Dr. Kyere's employment terms and conditions, initiating a medical review investigation into Dr. Kyere without good cause, placing his medical license in jeopardy, and demanding that he undergo an overly broad and unlawful medical examination, LBH violated the contract's implied covenant that each party to the agreement act in good faith and deal fairly with the other.

395. LBH's abuse of its discretion accorded to it under the contract and bad faith conduct was also recognized by the EEOC, a federal agency created to enforce employment antidiscrimination laws, which issued a Determination Letter on June 12, 2023 finding that LifeBridge Health engaged in unlawful employment discrimination in violation of the

Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008.

396. Ultimately, LBH informed Dr. Kyere that it would terminate his employment agreement for refusing to undergo the overly broad and unlawful medical examination if he did not resign.

397. To avoid being terminated without cause, Dr. Kyere signed a separation agreement and was constructively discharged from his employment effective September 15, 2022.

398. Due to LBH's breach of the employment contract's implied covenants, Dr. Kyere was forced to resign, incur lost wages to be paid under the contract, and suffer emotional and reputational harm.

**COUNT VIII: BREACH OF CONTRACT AND VIOLATION OF DUE PROCESS RIGHTS—MEDICAL STAFF BYLAWS—ALL DEFENDANTS, INDIVIDUALLY AND IN THEIR PERSONAL CAPACITY**

399. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 398 as if fully set forth herein.

400. At all times relevant hereto, Dr. Kyere was a member of the Sinai Hospital Medical Staff (hereinafter referred to as the "Medical Staff").

401. The Medical Staff is subject to Sinai Hospital Medical Staff Bylaws.

402. Under Maryland law, Sinai Hospital's Medical Staff Bylaws is an enforceable contract between the hospital, Medical Staff Association, and members of the Medical Staff.

403. These Bylaws outline the purpose, powers, and functions of the Medical Staff.

404. Per the express terms of the Medical Staff Bylaws, one of the purposes of the Medical Staff is to "perform peer review and make recommendations regarding the clinical privileges of members."

405. The overly broad and unlawful medical inquiries concerning Dr. Kyere were made under the auspices of the powers and functions of the Medical Staff.

406. Per the Medical Staff Bylaws, the Medical Staff has committees and subcommittees, including MEC and its subcommittees.

407. The MEC is authorized to receive and act on reports and recommendations from medical staff committees, including from the MEC subcommittees.

408. One subcommittee of the MEC is the IPC, which was formed to "carry out activities outlined in the Impaired Practitioner Policy."

409. The Impaired Practitioner Policy identifies an "impaired practitioner" as one "whose ability to practice medicine with reasonable skill and safety is impaired because of a physical, psychiatric or emotional illness, including deterioration through the aging process, loss of motor skills, or excessive use or abuse of drugs, including alcohol."

410. With respect to Dr. Kyere, Dr. Durand and LBH alleged that he may not be able to "practice medicine with reasonable skill and safety" due to his disability which manifested as an abnormal gait.

411. Using the Impaired Practitioner Policy, Dr. Durand, without any objective evidence or reasonable basis and in bad faith, made a report to the Medical Staff President that Dr. Kyere had a physical illness which impaired his ability to practice medicine with reasonable skill and safety.

412. In turn, the President of the Medical Staff, an employee of LBH, forwarded the report to the IPC.

413. The IPC is a medical review committee under the Health Occupations Article of the Maryland Code established by the medical staff which "[e]valuates the qualifications, competence, and performance of providers of health care" as well as "[e]valuates and acts on matters that relate to the discipline of any provider of health care." Md. Code Ann., Health Occ. § 1-401.

414. In accordance with the Impaired Practitioner Policy, the IPC was required to "evaluate the concern and, in its sole discretion, may further investigate such matters."

415. In any event, "[w]ithin 30 days of receipt of the complaint or self-referral," the IPC was required to "recommend to the MEC a course of action to be taken with respect to the impaired practitioner" including "taking no action; further investigation; confronting the impaired practitioner informally or formally with an offer of assistance; and/or demanding a change in behavior."

416. In accordance with the Impaired Practitioner Policy, the "IPC shall also make a recommendation to the MEC concerning whether the practitioner should maintain clinical privileges, whether such privileges require modification, or whether such privilege should be suspended or terminated."

417. In lieu of making recommendations to the MEC as to whether further action or investigation concerning Dr. Kyere was necessary or any recommendations concerning his clinical privileges, the IPC insisted that Dr. Kyere undergo an unlawful and overly broad medical examination in violation of federal law despite his refusal based on his federally protected rights.

418. When Dr. Kyere expressed his opposition to the overly broad and unlawful medical examination without limits on the scope of such examination, the IPC continued to demand

that Dr. Kyere undergo the unlawful medical examination over a period of *several* months without following the clear and express terms of the Impaired Practitioner Committee or informing the MEC of Dr. Kyere's refusal to submit to the overly broad and unlawful medical examination it proposed.

419. Had the IPC had a genuine and legitimate belief that Dr. Kyere's disability either precluded or could have precluded him from providing safe and effective patient care, the IPC was required to and would have informed the MEC of Dr. Kyere's refusal to comply with its investigation and made a recommendation concerning whether Dr. Kyere should continue to have clinical privileges at any LBH hospital.

420. LBH and IPC had authority, if acting in good faith and in accordance with the Medical Staff Bylaws, to make any recommendation to the MEC, including and up to revocation or suspension of Dr. Kyere's medical privileges, if it had credible and veracious bases to question Dr. Kyere's ability to practice medicine with reasonable skill and safety.

421. The fact that Dr. Kyere refused to submit to an overly broad and unlawful medical examination does not change the authority of the IPC or the rights of LBH under the Medical Staff Bylaws.

422. LBH and IPC's failure to make a recommendation to the MEC within 30 days of receiving a report concerning Dr. Kyere, in accordance with the express mandates of the Impaired Practitioner Policy, was done under the direction of Dr. Durand and the IPC and done in bad faith to deny Dr. Kyere procedural due process guaranteed to him under the Bylaws.

423. LBH and IPC's failure to make a recommendation to the MEC within 30 days of receiving a report concerning Dr. Kyere, in accordance with the express mandates of the Impaired Pracitioner Policy, was a breach of the contract between Dr. Kyere and the Medical Staff of which he was a member.

424. Any recommendation to the MEC affecting Dr. Kyere's clinical privileges would have implicated Dr. Kyere's due process rights guaranteed to him under the Medical Staff Bylaws.

425. Demanding an overly broad and unlawful medical examination, without making a timely recommendation to the MEC which would have triggered Dr. Kyere's due process rights guaranteed to him under the Medical Staff Bylaws was intentional and bad faith conduct aimed at embarrassing and harassing Dr. Kyere in breach of the express provisions of the Medical Staff Bylaws.

426. Despite asserting that there was a reasonable basis to question whether Dr. Kyere could practice medicine with reasonable skill and safety, the IPC and LBH engaged in unrelenting demands to force Dr. Kyere to undergo an overly broad and unlawful medical examination in violation of federal law, while also permitting him to continue to perform hundreds of procedures, in violation of the Medical Staff Bylaws.

427. Under Maryland contract law, in every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the other.

428. Maryland contract law also requires that the implied covenant of good faith governs the manner in which a party to a contract may exercise the discretion accorded to it by the terms of the agreement. Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing.

429. Under the Medical Staff Bylaws, LBH and IPC were afforded discretion to ensure that Dr. Kyere would practice medicine with reasonable skill and safety at all times. After Dr. Kyere obtained a reasonable accommodation in accordance with his statutorily protected rights under federal and state law, LBH exercised that discretion to demean and harass Dr. Kyere and make it impossible for him to continue to perform under the contract.

430. By initiating and undertaking a baseless and bad faith investigation pursuant to the Impaired Practitioner Policy of the Medical Staff, LBH and the IPC violated the contract's implied covenant that each party to the agreement act in good faith and deal fairly with the other.

431. LBH and IPC's abuse of its discretion accorded to it under the Medical Staff Bylaws and bad faith conduct was recognized by the EEOC, a federal agency created to enforce employment antidiscrimination laws, which issued a Determination Letter on June 12, 2023 finding that LBH employees, who acted in their capacity as employees of LBH and as members of the Medical Staff, engaged in unlawful employment discrimination in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008.

432. As a result of LBH and the IPC's breach of the express terms and implied covenants of the Medical Staff Bylaws, Dr. Kyere was forced to resign from his position, incur lost wages to be paid under the contract, and suffer emotional and reputational harm.

**COUNT IX: GROSS NEGLIGENCE—INDIVIDUALLY, IN THEIR PERSONAL CAPACITY, DRS. DANIEL DURAND, ELIZABETH ZADZIELSKI, OMAR ZALATIMO, AND FIVE OTHER UNKNOWN MEMBERS OF THE IPC**

433. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 432 as if fully set forth herein.

434. At all times relevant hereto, Dr. Kyere was a member of the Sinai Hospital Medical Staff (hereinafter referred to as the "Medical Staff").

435. The Medical Staff is subject to Sinai Hospital Medical Staff Bylaws.

436. Under Maryland law, Sinai Hospital's Medical Staff Bylaws is an enforceable contract among the hospital, Medical Staff Association, and members of the Medical Staff.

437. Per the express terms of the Medical Staff Bylaws, one of the purposes of the Medical Staff is to "perform peer review and make recommendations regarding the clinical privileges of members."

438. The overly broad and unlawful medical inquiries concerning Dr. Kyere were made under the auspices of the powers and functions of the Medical Staff.

439. Per the Medical Staff Bylaws, the Medical Staff has committees and subcommittees, including the MEC and its subcommittees.

440. The MEC is authorized to receive and act on reports and recommendations from medical staff committees, including from the MEC subcommittees.

441. One subcommittee of the MEC is the IPC which was formed to "carry out activities outlined in the Impaired Practitioner Policy."

442. The Impaired Practitioner Policy identifies an "impaired practitioner" as one "whose ability to practice medicine with reasonable skill and safety is impaired because of a physical, psychiatric or emotional illness, including deterioration through the aging process, loss of motor skills, or excessive use or abuse of drugs, including alcohol."

443. With respect to Dr. Kyere, Dr. Durand and LBH alleged that he may not be able to "practice medicine with reasonable skill and safety" due to his disability which manifested as an abnormal gait and referred him to the IPC for investigation.

444. Under Maryland law, the IPC is a medical review committee as it is a "committee of the medical staff or other committee. . . of a hospital" formed by the "governing board of the hospital" which "forms and approves the committee or approves the written bylaws under which the committee operates." Md. Code Ann., Health Occ. § 1-401.

445. The IPC also qualifies as a medical review committee under Maryland law because its function is to "[e]valuate[] the qualifications, competence, and performance of providers of health care" and "acts on matters that relate to the discipline of any provider of health care." *Id.*

446. Under Maryland and federal law, the IPC members had a duty to undertake any medical review activities with care and due diligence and in good faith. Md. Code Ann., Cts. & Jud. Proc. § 5-637; 42 U.S.C.A. § 11112.

447. Only "person who acts in good faith and within the scope of the jurisdiction of a medical review committee [are] not civilly liable for any action as [] member[s] of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee." *Id.*

448. In accordance with the Impaired Practitioner Policy, the IPC was required to "evaluate the concern and, in its sole discretion, may further investigate such matters."

449. Pursuant to the Impaired Practitioner Policy, "[w]ithin 30 days of receipt of the complaint or self-referral," the IPC was required to "recommend to the MEC a course of action to be taken with respect to the impaired practitioner" including "taking no action; further investigation; confronting the impaired practitioner informally or formally with an offer of assistance; and/or demanding a change in behavior."

450. In accordance with the Impaired Practitioner Policy, the "IPC shall also make a recommendation to the MEC concerning whether the practitioner should maintain clinical privileges, whether such privileges require modification, or whether such privilege should be suspended or terminated."

451. In lieu of reviewing all relevant information presented to the Committee and making recommendations to the MEC as to whether further action or investigation concerning Dr. Kyere was necessary or making any other recommendations concerning his clinical privileges, the IPC insisted that Dr. Kyere undergo an unlawful and overly broad medical examination in violation of federal law despite his refusal based on his federally protected rights.

452. Even when Dr. Kyere expressed his opposition to the overly broad and unlawful medical examination and his unequivocated refusal to undergo such an examination without limits on the scope of such examination, the IPC continued to demand that Dr. Kyere undergo the unlawful medical examination over a period of *several* months without following the clear and express terms of the Impaired Practitioner Policy by informing the MEC of Dr. Kyere's refusal to submit to the overly broad and unlawful medical examination it proposed.

453. Had the IPC had a genuine and legitimate belief that Dr. Kyere's disability either precluded or could have precluded him from providing safe and effective patient care, the IPC would have informed the MEC of Dr. Kyere's refusal to comply with its investigation and made a recommendation concerning whether Dr. Kyere should continue to have clinical privileges at any LBH hospital.

454. LBH and IPC had authority, if acting in good faith and in accordance with the Medical Staff Bylaws, to make any recommendation to the MEC, including and up to revocation or suspension of Dr. Kyere's medical privileges, if it had credible and veracious bases to question Dr. Kyere's ability to practice medicine with reasonable skill and safety.

455. The grossly negligent conduct of the IPC is evidenced by its failure to make any recommendations to the MEC concerning Dr. Kyere and its highly doubtful purported genuine concerns about his ability to provide safe patient care while also permitting Dr. Kyere to continue to perform more than 200 procedures after it was convened until his constructive discharge from LBH in September 2022.

456. The fact that Dr. Kyere refused to submit to an overly broad and unlawful medical examination does not change the authority of the IPC or rights of LBH under the Medical Staff Bylaws.

457. The IPC's demand that Dr. Kyere undergo an overly broad and unlawful medical examination is deemed a "professional review action" under Maryland and federal law. 42 U.S.C.A. § 11151 ("The term "professional review action" means ***an action or recommendation*** of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and ***which affects (or may affect) adversely the clinical privileges***, or membership in a professional society, ***of the physician***. Such term includes ***a formal decision of a professional review body not to take an action or make a recommendation*** described in the previous sentence and also includes professional review activities relating to a professional review action.") (Emphasis added.)

458. A "professional review action must be taken—(1) in the ***reasonable belief*** that the action was in the ***furtherance of quality health care***, (2) after a ***reasonable effort to obtain the facts of the matter***, (3) ***after adequate notice and hearing procedures*** are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) ***in the reasonable belief that the action was warranted*** by the facts known ***after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)***." 42 U.S.C.A. § 11112. (Emphasis added.)

459. Based on federal law, the IPC could not compel Dr. Kyere to undergo an overly broad and unlawful medical examination, especially without the due process rights guaranteed to him under the Healthcare Quality Improvement Act and the Medical Staff Bylaws governing his clinical privileges at LBH.

460. The IPC breached its contractual and statutory duty to engage in its medical review activities with care and due diligence and in good faith when it relentlessly demanded that Dr. Kyere undergo an overly broad and unlawful medical examination despite having no objective or legitimate basis to make such a demand and despite being advised of the unlawful nature of its actions and the violation of Dr. Kyere's rights under federal and state law.

461. The IPC's shabby, amateurish, unprincipled, and unprofessional medical review was conducted in bad faith and aimed at demeaning, harassing, and humiliating Dr. Kyere.

462. The IPC's insistence on forcing Dr. Kyere to undergo an overly broad and unlawful medical examination is especially egregious and grossly negligent considering the detailed letters sent to LBH and the IPC from Dr. Kyere's counsel outlining the federal prohibitions against the medical examination it was seeking, Dr. Kyere's complication rate, the fact that Dr. Kyere had never had any adverse patient safety event, the IPC's ability to independently verify Dr. Kyere's ability to perform all procedures in accordance with standard of care by reviewing images captured during every procedure stored in each

patient's medical record, and all other objective evidence proving Dr. Kyere's disability had no impact on his ability to provide safe and effective patient care.

463. The IPC's insistence on forcing Dr. Kyere to undergo an overly broad and unlawful medical examination or jeopardize his medical license, employment, or clinical privileges was reckless conduct undertaken after an intentional failure to perform its manifest duty to act with due diligence and in good faith and done with utter indifference to Dr. Kyere's rights protected under federal and state law as if Dr. Kyere had no such rights.

464. The IPC's shabby, amateurish, unprincipled, and unprofessional medical review which culminated in its relentless demand that Dr. Kyere undergo an overly broad and unlawful medical examination resulted in the constructive discharge of Dr. Kyere from his employment with LBH.

465. Dr. Kyere's constructive discharge from his employment resulted in Dr. Kyere suffering lost wages to be paid under his employment contract and emotional and reputational harm.

**COUNT X: CIVIL CONSPIRACY BETWEEN LBH AND DEFENDANTS, INDIVIDUALLY AND IN THEIR PERSONAL CAPACITY**

466. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 465 as if fully set forth herein.

467. For at least three years prior to making a request for a reasonable accommodation, Dr. Kyere's disability and its manifestation as an abnormal gait has been apparent and known to LBH.

468. Prior to Dr. Kyere making a request for a reasonable accommodation, LBH never made any allegations that his disability impaired his ability to safely perform the essential functions of his job.

469. After Dr. Kyere made a request for a reasonable accommodation and retained counsel to assist him in obtaining same, LBH, at the behest of Dr. Durand, sought to unlawfully, and in breach of his employment contract, terminate Dr. Kyere from his employment.

470. To achieve such a goal, LBH and Dr. Durand made unfounded and contrived allegations that Dr. Kyere was unable to provide safe patient care.

471. Based on such unfounded and contrived allegations, LBH and Dr. Durand recruited Drs. Zalatimo, Zadzielski, and other unknown persons as members of the IPC to achieve their unlawful and illicit scheme to terminate Dr. Kyere from his employment by opening an investigation into his health.

472. Drs. Zalatimo, Zadzielski, and other unknown members of the IPC entered into an unlawful

agreement and/or understanding with Dr. Durand and LBH to demand an unlawful medical exam which they knew Dr. Kyere would find intolerable and refuse to submit to.

473. Collusion among the Defendants to violate Dr. Kyere's rights to be free from discrimination based on his disability and to subject Dr. Kyere to overly broad and extensive medical examination is unlawful under Maryland law. Md. Code Ann., State Gov't § 20-801 ("A person may not: (1) aid, abet, incite, compel, or coerce any person to commit a discriminatory act; (2) attempt, directly or indirectly, alone or in concert with others, to commit a discriminatory act; or (3) obstruct or prevent any person from complying with this title or any order issued under this title."); Md. Code Regs. 14.03.02.04 ("A covered entity may not. . .[f]ail to make an ***individualized assessment*** of a qualified individual with a disability's ability ***to perform the essential functions of a job.***") (emphasis added).

474. At all times relevant hereto, Dr. Kyere informed all Defendants and other unknown members of the IPC of his unequivocal right to be free from demands to undergo an overly broad and unlawful medical examination.

475. At all times relevant hereto, Dr. Kyere informed all Defendants and other unknown members of the IPC of his unequivocal right to be free from discrimination based on his disability.

476. At all times relevant hereto, all Defendants and other unknown members of the IPC knew that their conduct with respect to their request for a broad and sweeping medical exam spanning two days and requiring disclosure of extensive medical history was unlawful and had nothing to do with determining whether his disability prevented him performing the essential functions of his job, but rather was aimed at harassing and embarrassing him.

477. At all times relevant thereto, all Defendants knew that the nature of Dr. Kyere's medical practice permitted a post hoc review of any procedure he has ever performed allowing Defendants to determine whether Dr. Kyere's disability impacted his ability to perform the essential functions of his job not by pursuing unlawful medical examination but by examining medical records of his patients. Despite such recourse, Defendants conspired to violate the law to harass, embarrass, and compel Dr. Kyere to resign from his employment.

478. At all times relevant hereto, Drs. Durand, Zalatimo, and Zadzielski were also members of the Sinai Hospital Medical Executive Committee established under the Medical Staff Bylaws as required by The Joint Commission—an independent, not-for-profit organization which is the nation's oldest and largest standards-setting and accrediting body in health care, recognized as an accrediting body of all licensed healthcare facilities under the Maryland Code.

479. Sinai Hospital is a Joint Commission accredited hospital.

480. Accreditation and certification standards established by The Joint Commission requires the medical staff to implement a process to identify and manage practitioner health issues which is separate from the disciplinary Process. These standards require that any process implemented to identify and manage practitioner health issues—such as formation of Committee like the IPC—require that no member of the MEC participate on a committee evaluating a practitioner's health.

481. Under such standards promulgated by The Joint Commission, any member of the IPC was required to have knowledge, training, and experience in "illness and impairment recognition issues specific to licensed independent practitioners."

482. Such standards also required that the "organized medical staff designs a process that provides education about licensed independent practitioner health."

483. These standards also recognize the inherent conflict with appointing Medical Executive Committee (MEC) members to a practitioner health committee such as the IPC.

484. According to The Joint Commission, an accredited institution's duty to investigate the wellbeing of practitioners to ensure patient safety was not mutually exclusive with protection or respect for rights afforded to a practitioner under federal law. ("*Organizations should consider the applicability of the Americans with Disabilities Act (ADA) to their credentialing and privileging activities, and, if applicable, review their medical staff bylaws, policies, and procedures. Federal entities are required to comply with the Rehabilitation Act of 1974.)* (emphasis in original).

485. Despite knowledge of such standards promulgated by The Joint Commission—which Dr. Kyere had expressly pointed to at the outset of the entire saga—and in violation of such standards, LBH, at the behest of Dr. Durand, selected members of the MEC to be members of the IPC although the medical staff had never designed a process that provides education about practitioner health, and such individuals had never had any education or training in "illness and impairment recognition issues" specific to practitioners.

486. The purpose of the conspiracy between LBH and all Defendants was to work in concert to violate Dr. Kyre's rights to be free from overly broad and unlawful medical examination and discrimination on the basis of his disability as well as breach of the terms of Dr. Kyere's employment contract.

487. Under Maryland law, a breach of contract is unlawful. Therefore, it is unlawful for a third person to knowingly aid the maker of a contract in breaking it. If the maker combines with others to break the contract, their conduct is a conspiracy which entitles the other party to the contract to recover against the conspirators any damages he may sustain.

488. Using the medical staff organization, LBH, at the behest of Dr. Durand, conspired with Defendants who were members of the MEC, in violation of standards promulgated by The Joint Commission, to breach Dr. Kyere's employment contract and subject Dr. Kyere to unlawful disability discrimination and medical examination in retaliation for engaging in a protected activity under the State Government Article.

489. At all relevant times hereto Drs. Zadzielski, Zalatimo, and other unknown members of the IPC knowingly conspired to aid LBH and Dr. Durand to violate Dr. Kyere's rights and breach his employment contract.

490. Under Maryland law, a conspirator can be liable for the conduct of a coconspirator.

491. As coconspirators, all Defendants engaged in overt acts in furtherance of the conspiracy to violate Dr. Kyere's rights under state and federal law and breach his employment contract, and each Defendant is liable for the conduct of other Defendants, whether such conduct was known or unknown to them.

492. As a result of Defendants' conspiracy and overt acts in furtherance of the conspiracy, Dr. Kyere suffered tortious injury including emotional distress, humiliation, pain and suffering, harm to his professional reputation, and economic loss, including lost wages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

(a) Grant judgment for Plaintiff against Defendants on all counts;

(b) Enter Judgment against Defendant LBH to pay Plaintiff, as equitable relief, back pay, prejudgment interest, fringe benefits, front pay, punitive damages and any other appropriate relief to make Plaintiff whole and compensate him for the civil rights and other violation described above, in the amount of $7,500,000.00;

(c) Enter judgment against Defendant LBH to pay Plaintiff compensatory damages in the amount of $300,000.00;

(d) Enter Judgment against Defendants Drs. Durand, Zadzielski, and Zalatimo to pay Plaintiff compensatory and punitive damages in the amount of $7,500,000.00;

(e) Order Defendants to pay Plaintiff's reasonable attorney's fees and costs; and

(f) Order any other relief that the Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues.

Date: November 27, 2023

Respectfully Submitted,

Tiffany M. Releford, Esq. (0512140304)
Sigrid C. Haines, Esq. (9006280100)
Samuel P. Morse, Esq. (2012180120)
Whiteford, Taylor & Preston L.L.P.
8830 Stanford Boulevard, Suite 400
Columbia, MD 21045
(202) 659-6764
(410) 347-8753
(410) 347-8708
treleford@whitefordlaw.com
shaines@whitefordlaw.com
smorse@whitefordlaw.com
*Counsel for Plaintiff*