SINAI HOSPITAL
*A LifeBridge Health Center*

EXHIBIT 6

February 11, 2021

Sampson K. Kyere, Jr., M.D., Ph.D.
5134 Northern Fences Lane
Columbia, Maryland 21044

Dear Dr. Kyere:

This letter of agreement ("LOA") sets out the key terms of your employment by Sinai Hospital of Baltimore, Inc. (the "Hospital") for the period set forth below.

1. **Appointment**. The term of your employment will begin as late as June 1, 2021, or such earlier date as mutually agreed by the Hospital, you and your current employer American Radiology (the "Effective Date") and continue through June 30, 2024. The Hospital and you agree to enter into an amendment to this LOA to document the Effective Date once it is known. This is a full-time position.

2. **Department/Division**. You will be appointed as a physician in the Department of Radiology ("Department"), in the Division of Interventional Radiology ("Division"). In addition, you will serve as the Medical Director of the Division ("Medical Director"), in which role you will have the responsibilities set forth on Exhibit A hereto (the "Medical Director Responsibilities"). The Division provides coverage at the Hospital, Northwest Hospital Center, Inc. and Grace Medical Center, Inc., and you will see patients at each facility. During the term of your employment the Division may also provide coverage at Carroll Hospital Center, Inc.

3. **Responsibilities and Compensation**. Your responsibilities and compensation will be as follows:

| | |
|---|---|
| **Clinical**: Outpatient and inpatient care | $427,500.00 |
| **Administrative**: Medical Director Responsibilities | $47,500.00 |
| **Research**: Duties as assigned by the Chief or the President | $0.00 |
| **Teaching**: Duties as assigned by the Chief or the President | $0.00 |
| **Total base salary:** | $475,000.00 |
| **wRVU threshold for incremental income**: | 5,000 |
| **Incentive rate for wRVUs above the threshold:** | $35.00 |

Salary and the wRVU threshold will be prorated for any period of less than a full fiscal year (July 1 – June 30). Additional or more specific responsibilities may be contained in a position description or specified from time to time by the Chief of the Department ("Chief") or a designee.

**4. Additional Provisions.**

**A.** Post-Employment Geographic Restrictions. Following the term of your employment, you will be subject to no geographic restrictions with respect to the practice of medicine.

**B.** Call Coverage. You will be required to take call for the Division 13 weeks per year, compensation for which is included in your base salary ("Required Call"). You may be given the opportunity to voluntarily take additional call, beyond your Required Call, for which you will be compensated at the rate of $750.00 per weekday and $1,250.00 per weekend day.

**C.** Signing Bonus. You will receive a one-time signing bonus in the amount of $75,000 which will be paid as soon as practicable after the Effective Date, on a regular payroll date. In the event that your employment with the Hospital is terminated within 12 months of the Effective Date for any reason, except for your death, disability, or the Hospital's material breach of this LOA or the Standard Terms and Conditions Governing the Employment of Members of the Sinai Hospital Faculty ("Standard Terms") (as such disability and material breach are defined in Section 15 of the Standard Terms), you shall repay to the Hospital the full amount of the signing bonus. You hereby authorize the Hospital to withhold from your paychecks (including your final paycheck) and any other monies owed to you by the Hospital, any amounts necessary to repay the signing bonus, and you agree to promptly repay any remaining balance of the signing bonus after such withheld amounts have been applied.

**D.** Performance Incentive Compensation. In addition to the productivity-based incentive compensation in Section 3 above, you will be eligible for performance-based incentive compensation, as described on Exhibit B to this LOA. The performance-based incentive compensation will be subject to the provisions of the Standard Terms dealing with incentive compensation.

**E.** Continuing Medical Education ("CME") and Professional Expenses. You will be entitled to use up to 10 days of paid time away from work each year for pre-approved CME activities, prorated for any period of less than a full year. Unused CME days may not be carried over from year to year. The Hospital will pay directly or reimburse you up to $5,000.00 per year, prorated for any period of less than a full year, for CME expenses and professional expenses, such as license fees, professional organization membership fees, professional journal subscriptions, and the like. Except as expressly set forth in paragraph, CME and expense reimbursement will be subject to the provisions of the Standard Terms dealing with CME and expense reimbursement.

**F.** Paid Time Off ("PTO"). You will be entitled to 40 days of PTO each year, which will be governed by the Department's Paid Time Off Policy (the "PTO Policy"). You acknowledge receipt of a copy of the PTO Policy, and acknowledge that under the PTO Policy, PTO may not be carried over from year to year and unused PTO will not be paid out.

**G.** Base Salary Reduction. The third paragraph of Section 5 of the Standard Terms, which deals with the reduction of base salary if a physician fails to meet his/her wRVU threshold for incentive compensation, shall not apply to you during the term of your employment hereunder.

**H.** Periodic Review. The Chief will be responsible for periodically reviewing the Medical Director role to ensure compensation you receive for serving as Medical Director is appropriate for the time spent performing the Medical Director Responsibilities and complies with all relevant regulatory requirements, including that such compensation must be fair market value and commercially reasonable. To that end, the Chief will periodically review the Medical Director Responsibilities, as well as the expected time commitment and actual time spent on the Medical Director Responsibilities. You agree to cooperate fully with the Chief in any such review, including by maintaining such records as may be reasonably necessary for the Chief to complete the review. Your failure to fully cooperate with the Chief in any such review will be considered by the Hospital to be good cause to terminate your service as Medical Director, in which event your administrative time will be reallocated as clinical time, and your wRVU threshold for incentive income will be adjusted accordingly. If the Hospital determines, in its sole discretion, that the Medical Director Responsibilities no longer accurately reflect the Hospital's or the Department's needs, the actual time spent on performing the Medical Director Responsibilities is, and is reasonably expected to continue to be, materially more or less than the then-current projected time commitment, or the Medical Director arrangement fails to comply with a relevant regulatory requirement, the Hospital and you will cooperate in good faith to amend the Medical Director Responsibilities, modify the time commitment, and/or modify the compensation, as applicable. Any changes under this section will be documented in an amendment to this LOA.

**I.** Termination and assignment. Notwithstanding anything to the contrary in the Standard Terms, at any time after the first anniversary of the Effective Date, you may terminate this LOA, without cause, upon giving the Hospital no less than 90-days' written notice, and at any time after the third anniversary of the Effective Date, the Hospital may terminate this LOA, without cause, upon giving you no less than 90-days' written notice. As set forth in the Standard Terms, the Hospital may only assign this LOA to an affiliate of the Hospital, and the Hospital agrees that it will not assign this LOA to any entity that is not an affiliate of the Hospital without your prior written consent.

**J.** Moonlighting. Commencing on the Effective Date and continuing through no later than June 30, 2023, in order to assist American Radiology through a business transition, with the Chief's written consent you will be permitted to moonlight for American Radiology on a limited basis. You will perform such moonlighting in your individual capacity, not in your capacity as an employee of the Hospital, and such moonlighting must not interfere with your ability to fully and timely satisfy your obligations to the Hospital under this LOA.

**K. ADDITIONAL TERMS OF YOUR EMPLOYMENT AND DEFINITIONS OF CERTAIN TERMS USED IN THIS LOA ARE CONTAINED IN THE STANDARD TERMS. THE STANDARD TERMS, AND ALL SCHEDULES AND EXHIBITS HERETO, ARE INCORPORATED HEREIN BY REFERENCE. THIS LOA AND THE STANDARD TERMS SUPERSEDE ANY OTHER AGREEMENTS BETWEEN YOU AND THE HOSPITAL REGARDING YOUR EMPLOYMENT DURING THE TERM OF YOUR EMPLOYMENT HEREUNDER.**

To confirm your agreement to the above terms, please sign and return an original of this LOA. A fully executed copy will be returned to you for your records.

Sincerely yours,

Matthew G. Poffenroth, M.D.
Chief Physician Executive

Daniel J. Durand, M.D.
Chief Innovation Officer / VP of Research
Chair, Department of Radiology

**By my signature below I agree to the foregoing terms and acknowledge receipt of a copy of the Standard Terms:**

Sampson K. Kyere, Jr., M.D., Ph.D.

Attachments: Exhibit A (Medical Director Responsibilities)
Exhibit B (Performance Incentive Compensation)
Standard Terms (Effective July 24, 2019)

# STANDARD TERMS AND CONDITIONS GOVERNING THE EMPLOYMENT OF MEMBERS OF THE SINAI HOSPITAL FACULTY

## Introduction

This document sets out standard terms and conditions that govern the employment of members of the physician faculty of Sinai Hospital of Baltimore, Inc. (sometimes referred to herein as "Sinai" or "Hospital"). As used herein, the term "faculty" applies to physicians who are employed by Sinai and are members of the Sinai medical staff, regardless of whether they have teaching responsibilities. This document does not, however, apply to members of the Sinai hospitalist group, residents, or fellows.

Specific conditions applicable to an individual physician, including the duration of the physician's employment and the physician's responsibilities and compensation, will be contained in a Letter of Agreement sent or otherwise delivered by the Hospital to the physician to be signed by the physician. A Letter of Agreement is not valid unless it is signed by the President of the Hospital ("President") or a Vice President of the Hospital. Each reference to "Vice President" in this document means a Vice President, Senior Vice President, Executive Vice President, or an equivalent executive. The Hospital may decline to accept a Letter of Agreement that is returned more than 30 days after it was sent or otherwise delivered to the physician. In the event of any conflict between this document and a Letter of Agreement, the terms of the Letter of Agreement will govern.

Physicians who have a traditional employment agreement (not a Letter of Agreement) will be bound by the provisions of that agreement, rather than the provisions of this document, until its expiration.

Each physician will be a member of a Hospital department, as specified in the Letter of Agreement. In this document, "Department" refers to the department named in the Letter of Agreement, and "Chief" refers to the Chief of the Department. Any action permitted to be taken under the Letter of Agreement or this document by a designee of the President may be taken by a Chief. When a Chief is entering into an employment relationship with the Hospital, any references in this document or the Letter of Agreement to decisions to be made by the Chief shall instead be made by the President.

Sinai is a subsidiary of LifeBridge Health, Inc. ("LifeBridge"). As used in these standard terms and conditions, an "affiliate" of Sinai means any entity that is owned or controlled, directly or indirectly, by LifeBridge.

## 1. Term of Employment

The expected term of a physician's employment will be set out in the Letter of Agreement. The term may only be shortened in accordance with Section 15 of these standard terms and conditions.

At the end of the period specified in the Letter of Agreement and each one-year period thereafter, the physician's employment will automatically be extended for an additional one-year term on the same terms and conditions, unless (i) either party has given the other at least 90 days' notice of its intention not to renew, or (ii) the Letter of Agreement specifically provides that it is not automatically renewable. As used in these standard terms and conditions, the "term of employment" includes all such renewal periods. Except in the specific circumstances described in Section 15, a physician may voluntarily end his/her employment only as of the end of a term, and then only if the physician has provided notice as specified above.

When a physician enters into a Letter of Agreement, unless it includes language to the contrary, the Letter of Agreement supersedes all existing agreements between the physician and Sinai regarding the physician's provision of professional services to the Hospital, and any existing agreements will terminate on the effective date of the Letter of Agreement.

A physician may not begin employment until he/she has a license to practice medicine in Maryland, has received appropriate clinical privileges at the Hospital and at the other institutions specified in the Letter of Agreement, has passed the Hospital's standard pre-employment physical (including drug screen) and background check, and, if applicable, has been granted an immigration status that will allow him/her to work at Sinai throughout the term of the Letter of Agreement.

**2. <u>Outside Activities</u>**

Physicians employed by the Hospital are engaged on a full-time basis.

In addition to his/her regularly scheduled hours, a physician may be required to be on call during non-office hours, including some nights, weekends, and holidays, in accordance with a schedule developed by the Chief or his/her designee. A physician who is on call is required to respond when called in accordance with the Department's protocols and standards.

Physicians are encouraged to engage, on a volunteer basis, in charitable and community pursuits that do not involve the practice of medicine, as long as those activities do not interfere with, present a conflict with, or compete with the physician's duties to the Hospital. Activities involving the use of Hospital facilities or resources require approval of the responsible Vice President.

A physician may not undertake any other compensable activities while a Hospital employee unless the physician has received prior written approval from the Chief, and such activities are performed outside of the physician's scheduled hours, do not otherwise interfere with the physician's performance of his/her duties as specified in the Letter of Agreement and these standard terms and conditions, do not compete with the Hospital or cause a conflict of interest, and do not in any way utilize Hospital facilities or resources. If the physician will be receiving compensation from a third party pursuant to a written agreement, the physician must provide the Chief with a complete copy of such agreement and a written summary of any relevant facts not set forth in the actual agreement. If the physician receives compensation from a third party other than pursuant to a written agreement, the physician must inform the Chief in

writing of the terms of the arrangement, including the name of the entity to which the physician provides services, the nature of the services, the times during which the physician provides such services, the amount of compensation that physician receives for doing so, and any other information that the Chief may request. If, after initial approval is received from the Chief, there is a change in the terms of the physician's outside activity, the physician must provide the Chief with updated information and secure the Chief's approval to continue the arrangement.

A Chief who is asked to consent to a physician's outside activities will not unreasonably withhold consent; however, consent may be withdrawn at any time if the Chief determines the physician has failed to comply with the preceding paragraph, or the outside activity no longer satisfies the requirements of the preceding paragraph.

**3. <u>Representations</u>**

By signing a Letter of Agreement, a physician represents and warrants to Sinai that:

a. the physician is not under any obligation that would in any way prevent, limit, or conflict with his/her ability to work for and at Sinai in accordance with the terms of the Letter of Agreement and these standard terms and conditions;

b. except as previously disclosed on his/her application for privileges, the physician has not been named as a defendant in any malpractice action;

c. if the physician is not a United States citizen, either the physician is authorized to work in the United States throughout the term of the Letter of Agreement, and has provided documentation of that authorization to the Hospital's Department of Human Resources, or the Hospital has agreed to sponsor the physician under the applicable work visa program;

d. the physician has fully disclosed in writing any ownership interests and compensation arrangements that he/she has in or with any other provider of health care services or products (such as an ambulatory surgery center, pharmacy, home health agency, pharmaceutical company, or medical equipment supplier), whether or not that provider does business with or competes with the Hospital or another LifeBridge entity;

e. the physician has disclosed any dependency on or habitual use or abuse of alcohol or controlled substances or any participation in any alcohol or controlled substance detoxification, treatment, recovery, rehabilitation, counseling, screening, or monitoring program;

f. the physician has fully disclosed to the Chief any other outside activities that the physician engages in for compensation; and

g. the physician is in good standing with, and is not currently on probation with or under investigation by, the Maryland Board of Physicians, the Centers for Medicare & Medicaid Services ("CMS"), the Drug Enforcement Agency, and all other relevant federal, state, and local regulatory agencies.

Each physician agrees to promptly notify Sinai if at any time during his/her employment any of the above ceases to be true.

## 4. Standards of Conduct

In addition to the specific responsibilities set out in the Letter of Agreement, a physician is required to adhere to the following standards:

*Patients to be Served*

Each physician is expected to serve Medicare and Medical Assistance patients, as well as patients for whom there is no source of payment. The quality of care that a patient receives must not vary based on the patient's financial status, race, religion, national origin, sex, sexual orientation, gender expression, or other protected status.

*Professional Standards*

At all times during his/her term of employment, a physician must:

a. comply with all applicable federal and state laws and regulations and with the bylaws, rules, regulations, policies, procedures, working requirements, and standards established from time to time by the Hospital, the Department, and the Hospital's medical staff;

b. be duly licensed to practice medicine in the State of Maryland and all other states in which the physician is expected to provide professional services; meet all reasonable professional criteria established by the Hospital and the Department, including staying current with new relevant medical information and meeting all applicable continuing medical education ("CME") requirements; and adhere to the clinical, medical, and quality assurance standards of the Hospital and the Department;

c. act in an ethical manner; treat patients and their families, physicians, and other members of the Hospital's staff with respect and compassion at all times; and work in close harmony with other clinical and administrative personnel of the Hospital;

d. not engage in any conduct that is unprofessional, unethical, immoral, or fraudulent; that is detrimental to the reputation, character, or standing of the Hospital (including disparaging the Hospital, or having others do so on the physician's behalf or at the physician's request); or that compromises the quality of care rendered to patients or the efficient operation of the Hospital, including providing services while impaired, all as reasonably determined by the President or his/her designee; and

e. comply with all applicable laws and regulations concerning the confidentiality of medical records and patient information.

A physician who is not board-certified at the time the Letter of Agreement is issued is to secure board certification in his/her area of practice within a time period agreed upon by the

physician and the President or his/her designee. Once board-certified, a physician is to maintain board certification throughout the term of his/her employment.

*Research*

In performing clinical research, a physician is required to abide by all requirements applicable to such activities, including the requirements of the institutional review board and administrative review board that review research conducted at the Hospital or involving the Hospital's patients.

*Medical Records*

Each physician is required to maintain accurate, complete, and up-to-date medical records (both office records and hospital records, as applicable) for all patients, in accordance with the standards of The Joint Commission; all applicable federal and state laws and regulations; and the bylaws, rules, regulations, and policies of the Hospital, the Department, and the Hospital's medical staff. Failure to timely complete medical records, as required by the Hospital's medical staff bylaws, rules and regulations, and relevant Hospital and medical staff policies, may lead to suspension or revocation of a physician's clinical privileges, and recurring failures will be grounds for terminating a physician's employment.

All such records will be the property of the Hospital and must not be removed from the Hospital either during employment, except to the extent required to provide patient care at a facility where a patient's records are not available electronically, and then only if appropriate measures are taken to safeguard such records, or upon termination. Upon termination of a physician's employment by the Hospital, the Hospital will make appropriate arrangements for patients' continuing care. The physician should provide the Chief with appropriate contact information so that patients who wish to contact the physician can do so. Once the physician has furnished appropriate contact information, the Hospital will be solely responsible for notifying patients regarding the physician's departure. Unless specifically authorized by the President or a Vice President, a physician may not contact patients or former patients, or use any Hospital records, including but not limited to patient lists, to inform patients of his/her departure or otherwise inform patients of his/her future practice location. If a patient asks, the Hospital will, with the physician's consent, inform the patient of the physician's new practice location and will furnish a copy of the patient's medical chart to the physician for purposes of the patient's continuing care by the physician, provided, however, that the Hospital shall be entitled to reimbursement from the physician for its reasonable costs in copying such patient records for the physician.

*Admissions/Referrals*

When a patient under the care of a physician requires hospitalization, the physician is to use his/her best efforts to admit the patient to Sinai or to another LifeBridge institution. Similarly, to the extent patients require services of another physician, the physician is to use his/her best efforts to make referrals to physicians who practice at Sinai or another LifeBridge institution. However, a physician will never be denied the discretion to which he/she is entitled

by law, nor will a physician ever be expected to take any action that is inconsistent with the best interests of his/her patients.

*LifeBridge Clinically Integrated Network and Accountable Care Organization*

LifeBridge has established the LifeBridge Clinically Integrated Network ("CIN"), a clinically integrated organization that includes the physicians and advanced practice providers employed by the Hospital and other LifeBridge affiliates, as well as certain members of the voluntary medical staff. The CIN has developed standards of clinical practice for all participants. In addition, LifeBridge has established the LifeBridge Health Accountable Care Organization (the "LifeBridge ACO"), which has entered into a shared savings contract with the federal Medicare program. Each physician is expected to become a member of the CIN and a participant in the LifeBridge ACO or their respective successor, and to abide by the standards they establish.

## 5. <u>Compensation and Benefits</u>

*Base Salary and Incentive Compensation*

Each physician's compensation formula will be specified in his/her Letter of Agreement. In many cases, the Letter of Agreement will group a physician's responsibilities into four categories (clinical, administrative, research, and teaching) and will assign a portion of the physician's total compensation to each category. The description of a physician's responsibilities in the Letter of Agreement is not intended to be comprehensive, but, rather, is intended to constitute a general statement of the physician's responsibilities in each area. If a job description for the physician's position has been developed, the contents of that job description will be deemed to be incorporated into the Letter of Agreement. The Chief may also develop, in consultation with the physician, a more detailed statement of the physician's responsibilities.

In many cases, a physician will be eligible for incentive compensation (sometimes referred to as "incremental compensation") for work that exceeds a specified wRVU (as defined below) or other threshold, or meets certain quality criteria, as stated in the Letter of Agreement. In some cases, a physician may be eligible for incentive compensation under a group incentive program. All such incentive programs will be governed by this section. For incentive compensation based on the physician's clinical activities, only professional services performed personally by the physician, and for which a professional charge is generated by the Hospital's billing system, will be counted. A physician will not receive credit for services performed by another individual (such as a physician assistant or nurse practitioner), even if that individual is working under the physician's oversight.

If a physician's Letter of Agreement has an initial term covering two or more fiscal years and the physician is eligible for incentive compensation based on a wRVU threshold, or a physician's Letter of Agreement sets a wRVU threshold for purposes of setting a minimum productivity level for maintaining his/her base salary, if the physician fails to meet the wRVU threshold in a fiscal year, starting with the next fiscal year, the Hospital may, in its sole discretion, reduce the physician's base salary by an amount equal to the wRVU shortfall multiplied by the wRVU rate used in establishing the clinical component of the physician's base

salary (this rate is typically higher than the rate used to calculate incentive compensation). For example, if a physician has a threshold of 5,000 wRVUs, but only generates 4,500 wRVUs in a fiscal year, then commencing with the next fiscal year, the physician's base salary may be reduced by an amount equal to 500 wRVUs multiplied by the applicable wRVU rate.

When a Letter of Agreement or this document makes reference to "wRVUs," the term means the number of work relative value units, calculated in the same manner as they are calculated for other Hospital faculty physicians, that are associated with the professional medical services rendered by the physician, coded in accordance with the requirements of CMS or other applicable third-party payor. No wRVUs will be recognized for facility or regulated services (including ambulatory surgical center facility services), or for the technical component of services for which a separate technical component is established by CMS. Similarly, relative value units attributable to practice expense and malpractice insurance will not be recognized. Any discrepancies regarding the appropriateness, applicability, or number of wRVUs will be reviewed and decided by a certified coder employed or otherwise retained by Practice Dynamics, Inc., in consultation with the physician. The coder's decision will be final.

Calculations of the amount of incentive compensation due as well as the actual distribution of incentive compensation will be made in accordance with the Hospital's standard policy, which may be changed without notice to physicians. All incentive programs, both individual and group, are based on performance over a full fiscal year, and the Hospital is only obligated to pay incentive compensation after the end of a fiscal year. The Hospital may elect to pay a draw or draws against the projected fiscal-year incentive compensation prior to the end of a fiscal year; however, the Hospital retains the right to withhold all or part of any incentive compensation until the end of the fiscal year to ensure that the criteria specified for the incentive was met. If a physician's employment is terminated by the physician other than as permitted in this document, or if the physician's employment is terminated by the Hospital under Section 15.c. or 15.d. of this document, the physician shall not be entitled to receive any incentive compensation that has not been distributed prior to the effective date of the termination, and the Hospital may require repayment of any incentive compensation for the fiscal year that was paid to the physician prior to the effective date of the termination.

If a physician is paid incentive compensation based on services that are subsequently determined to have been billed incorrectly or for which the Hospital is required to make a refund for any reason, or for any reason is otherwise paid more incentive compensation than he/she earned and was entitled to receive, the physician will be obliged to promptly repay such incentive compensation overpayment. Each physician authorizes Sinai to withhold from his/her paychecks, including his/her final paycheck, and any other monies owed to physician by Sinai, any amount necessary to repay any overpayment, and will promptly repay any remaining balance.

Absent manifest error, the Hospital's calculations regarding all matters relating to a physician's compensation will be final and binding.

A physician will be deemed to have not earned, and the Hospital may withhold, incentive compensation for a fiscal year if during the fiscal year the physician fails to pass all of the coding

audits conducted by the Hospital or its agents; fails to timely and accurately complete medical records as required by Hospital policy; fails to adhere to the Hospital's ethical, quality, and behavioral standards; or fails to meet other reasonable expectations of the Hospital.

If, after paying all or part of incentive compensation prior to the end of a fiscal year, the Hospital determines that incentive compensation was not earned, and will be withheld, because of the physician's failure to meet any part of the above eligibility criteria, then, in addition to forfeiting any unpaid portion of the incentive compensation, the paid portion will be considered to be an overpayment, and the provisions above regarding the repayment of overpayments will apply. In addition to the criteria above, in order to comply with Internal Revenue Service regulations regarding total compensation paid by a 501(c)(3) organization, a physician will not be considered to have earned, and the Hospital will withhold, incentive compensation to the extent that payment would cause the physician's total compensation to exceed the 90th percentile of compensation for physicians within the physician's specialty, based on current published data from nationally recognized salary surveys or similar criteria as determined by Sinai in its sole discretion, or a compensation cap documented in the physician's Letter of Agreement.

*Fringe Benefits*

Each physician will receive the Hospital's standard physician fringe benefit package, under the same terms and conditions as such benefits are made available to other similarly situated physician employees of the Hospital. Certain benefits are based on the physician's base salary, without regard to incentive compensation. Benefits for part-time physicians are different than benefits for full-time physicians. Determination of whether a physician is full- or part-time will be made in accordance with standard Hospital policy. All fringe benefits are subject to modification from time to time by the Board of Directors of LifeBridge, or a designee or committee thereof. All benefit programs are governed by the specific terms of the applicable plan document or policy, and in the event of any contradiction between the plan document or policy and these terms or the Letter of Agreement, the terms of the plan document or policy will control.

*Paid Time Off and CME*

Physicians, whether working full- or part-time, will be entitled to paid time off in accordance with the Hospital's standard policy regarding paid time off. Full-time physicians will be entitled to an additional five days per year to attend professional meetings and CME conferences ("CME Time"). CME Time will be prorated for periods of less than a full year for full-time physicians and for physicians who are scheduled to work less than full-time. Professional meetings and CME must be relevant to a physician's specialty or otherwise benefit the Department or the Hospital. A physician must abide by Department policies and procedures when scheduling time off, including obtaining prior approval from the Chief or the Chief's designee. CME Time may not be carried over from year to year.

*Reimbursement of Expenses*

Departments have individual policies with respect to payment of, or reimbursement for, documented professional expenses such as license fees, fees for memberships in professional organizations, subscription fees for professional journals, expenses for professional meetings and CME, and similar expenses. These policies may be changed from time to time based on budgetary considerations without notice to physicians. In no event will a physician be reimbursed for expenses in the absence of appropriate documentation. Travel and entertainment expenses, including those related to professional meetings and CME, are governed by LifeBridge's Business Travel, Meals, and Entertainment Policy. A physician must obtain prior approval from the responsible Vice President before incurring any travel or other non-routine expenses for which reimbursement will be sought. Unless a Department policy states otherwise, an annual expense allowance, if any, will be prorated for any period of less than a full year and may not be carried over from year to year.

**6. Professional Liability Insurance**

The Hospital will arrange for each physician to have malpractice insurance covering the physician for all activities performed as an employee of the Hospital, including any necessary "tail" coverage following the termination of physician's employment. The coverage will have policy limits of no less than $1 million per claim / $3 million annual aggregate. Except for "Good Samaritan" services rendered in an emergency, there will be no coverage for services performed outside of the scope of a physician's employment, including any services for which the physician is compensated by a third party. A physician must report all claims promptly and cooperate with the Hospital and its insurer in the defense of claims; failure to do so may result in loss of coverage. The exact terms and conditions of the insurance policy will be within the Hospital's discretion.

**7. Conflict of Interest**

All physicians are required to abide by the terms of any conflict of interest policy adopted by the Hospital or LifeBridge.

A physician may not, while employed by Sinai, acquire any ownership interest in, or enter into any compensation arrangement with, any other provider of health care services or products without the written consent of the President or his/her designee, or, in the case of a compensation arrangement, the Physician's Chief, regardless of whether that provider does business with or is competitive with the Hospital or another LifeBridge entity.

Any questions about whether a particular situation constitutes a conflict of interest or requires disclosure should be referred to the LifeBridge General Counsel's office.

## 8. Accountability

Each physician is accountable to the Chief or his/her designee with respect to credentialing, quality assurance, compliance with Hospital policies, and similar matters. In all other matters, including but not limited to compensation and working conditions, the physician is accountable to the President or his/her designee.

## 9. Facilities

It is the Hospital's responsibility to provide each physician with such space, staff, systems, supplies, and all other materials and equipment reasonably necessary to allow the physician to perform his/her duties. The Hospital will be the final decision maker as to the economics and patient need for the purchase of any requested items.

## 10. Billing and Managed Care Contracting

The Hospital will have the sole right to establish charges, and to bill patients or responsible third-party payors, for the professional services rendered by its physician employees. All fees collected for such services will be the sole property of Sinai or its designee. Each physician is required to cooperate with the Hospital in maintaining records and in providing information necessary for identification of services and procedures performed to facilitate prompt and accurate billing.

When selecting billing codes for services, a physician is required to adhere to the requirements of CMS and other third-party payors and the instructions provided by the Hospital's compliance staff. Failure to code and document in substantial compliance with the requirements of CMS or other applicable third-party payor (including both "overcoding" and "undercoding"), as interpreted by the Hospital's compliance staff, or to cooperate with the Hospital's compliance staff, or to abide by the Hospital's procedures for ensuring proper coding and documentation, will constitute grounds for termination of employment.

The Hospital has the sole right to negotiate with managed care plans on behalf of its employed physicians. Each physician is required to participate in those managed care contracts selected by the Hospital. A physician may not enter into any managed care contract other than through a group contract of the Hospital or LifeBridge. If, upon becoming a Hospital employee, a physician is a party to a managed care contract with any payor that has also executed a contract with Sinai or a Sinai affiliate, the physician must, if so requested by the Hospital, use all commercially reasonable efforts to replace that contract with a Sinai contract and to transition patients from the prior contract to the Sinai contract. Each physician is required to promptly forward all correspondence from managed care plans and other third-party payors to the practice administrator for the Department or his/her designee. As used in these standard terms and conditions, the term "managed care contracts" will include contracts with all types of insurance companies, health maintenance organizations, independent practice associations, employers, managed care organizations, provider-sponsored organizations, and other third-party payors.

**11. Inventions/Intellectual Property**

The Hospital desires to cooperate with physicians to advance medical research and knowledge, and will, in many circumstances, share the profits derived from intellectual property created by its employed physicians. The specific rules governing ownership of intellectual property and sharing of revenues are set out in LifeBridge's Intellectual Property Policy, which may be changed without notice to physicians. Each physician will be bound by the policy as in effect from time to time.

A physician has an obligation to promptly report to the President or his/her designee any intellectual property created by the physician while a Hospital employee, whether or not it is patentable or copyrightable.

**12. Nonsolicitation/Noncompetition**

*Nonsolicitation*

During the term of employment specified in the Letter of Agreement and for one year thereafter, a physician shall not, directly or indirectly, hire any employee of Sinai or any Sinai affiliate; urge, induce, entice, or in any manner solicit any employee of Sinai or any Sinai affiliate to leave his/her position; induce or attempt to influence any physician, health care facility, or any other professional with a referring relationship with Sinai to terminate that relationship; or solicit patients of Sinai or any of Sinai's affiliates. An advertisement in a publication with general circulation or on a physician's website that does not specifically or exclusively target such patients will not be considered solicitation for this purpose.

*Noncompetition*

A physician may also be subject to post-employment restrictions on competition as specified in the physician's Letter of Agreement.

If the Letter of Agreement indicates that the physician is to be subject to the standard post-employment restrictions, this means that, for one year after the end of the term of employment specified in the Letter of Agreement, the physician may not engage in the practice of medicine within a certain distance from the Hospital and each other LifeBridge site at which the physician spent 25% or more of his/her professional time during the last 12 months of the physician's employment by Sinai (the "Restricted Area"). For primary care physicians, the Restricted Area is a radius of 10 miles from each such location, and for other specialties, the Restricted Area is a radius of 20 miles from each such location. For this purpose, "primary care" includes internal medicine, family practice, general obstetrics, and pediatrics. The "practice of medicine" for this purpose includes, but is not limited to, (a) rendering any services for which a medical license is required, and (b) financial investment in any organization (other than an interest of less than 5% in a publicly-traded company) that participates, either directly or indirectly, in the delivery of professional medical services. There will be no restriction on a physician's ability to provide services in an emergency without compensation.

If the Letter of Agreement precludes a physician from working for a "Competitor," the term Competitor shall mean any entity that, directly or through an affiliate, owns or operates a hospital, health care system, faculty practice plan, or similar entity that conducts business within the Restricted Area.

All restrictions on a physician providing services within a defined area, working for a Competitor, or other comparable restrictions shall remain in effect until one year has elapsed after the end of the term of employment specified in the Letter of Agreement, even if the physician leaves his/her position before the scheduled end of the term.

A physician will not be bound by any post-employment restrictions on competition if (a) the physician's employment is terminated by the Hospital in a manner not permitted under these standard terms and conditions or the Letter of Agreement, (b) the physician is willing to renew the Letter of Agreement upon substantially the same terms and conditions and the Hospital is not willing to do so, unless the Hospital's unwillingness to renew is based on reasons that would permit the Hospital to terminate the physician's employment under Section 15(c) or 15(d) of these standard terms and conditions, (c) the physician's employment is terminated pursuant to the last paragraph of Section 16 of these standard terms and conditions, or (d) the physician terminates his/her employment pursuant to Section 15(c) of these standard terms and conditions as the result of an uncured breach by the Hospital.

## 13. Confidentiality

During the course of a physician's employment, he/she will have access to a variety of information concerning the procedures, patients, and practices of the Hospital and its affiliates, possibly including lists of patients' names and addresses. All such information is proprietary and is the property of the Hospital (or its affiliate, as the case may be) and should not be copied or removed from the Hospital either during employment or upon termination. A physician shall keep that information confidential and shall not use it for the solicitation of patients or any other purpose, except as specifically authorized by the Hospital.

## 14. Dispute Resolution

*Injunctive Relief*

By accepting employment with the Hospital, a physician agrees that the provisions of Sections 12 and 13 of these standard terms and conditions are of particular importance for the protection and promotion of the existing and future interests of Sinai and its affiliates, and that a breach of the physician's obligations under those Sections will likely result in irreparable harm to Sinai and/or its affiliates. Accordingly, in the event of a breach or threatened breach by a physician of any of the restrictions contained in either of those Sections, in addition to any other remedies available to them, Sinai and its affiliates shall be entitled to injunctive relief from any court having jurisdiction, without the need to demonstrate irreparable harm. If Sinai does obtain such an injunction, then whatever portion of the relevant restriction period had not expired as of the date the specific restrictive covenant was first violated, will begin to run from the date of the final court decision on the claim for injunctive relief.

The individual provisions of Sections 12 and 13 are independent of each other, and the invalidity of any one restriction shall not affect the validity of any other.

Should a court conclude that any of the restrictions contained in Sections 12 and 13 extend beyond what the court considers reasonable and enforceable, the court is authorized to modify those restrictions to the extent necessary to render those Sections reasonable and enforceable.

No alleged breach of the Letter of Agreement or this document shall be a defense to enforcement of Sections 12 and 13, and any such alleged breach shall be separately litigated.

*Dispute Resolution*

Most disagreements between honorable people can be resolved through negotiations conducted in good faith. Furthermore, even if the parties are unable to reach an agreement on their own, informal arbitration is more likely to produce a timely and fair resolution than are formal judicial proceedings.

Accordingly, except for injunctive relief for actual or threatened violations of Sections 12 and 13 as provided above, the exclusive method for resolving any controversy or claim arising out of a physician's employment, including any termination or nonrenewal, will be as set out below. These provisions supersede any other grievance procedure for Hospital employees provided under the Hospital's regular personnel policies.

If a dispute arises between the Hospital and a physician, the physician and a representative of the Hospital will meet informally within seven days to discuss the areas of disagreement and negotiate in good faith regarding possible solutions. As part of this dispute resolution process, the party raising the issue will, if the other so requests, provide a short and plain written statement setting forth that party's position regarding the dispute and that party's suggested resolution. The other party will provide a written response within 15 days, and the parties will then negotiate with each other for a period of at least 15 days in an effort to resolve the controversy.

If that process is unsuccessful in resolving the dispute, and either the physician or the Hospital wishes to continue the dispute resolution process, the dispute must be submitted to arbitration. The arbitration will be conducted by a single arbitrator, under the alternative dispute resolution procedures of the American Health Lawyers Association ("AHLA"). The authority of the arbitrator will be limited to a determination of the facts, and to the interpretation and application of specific provisions of the physician's Letter of Agreement and this document as they may apply to the issue. The arbitrator will be bound by the terms of the Letter of Agreement and this document, and will have no authority to add to, subtract from, amend, or modify their terms. The arbitrator will render an opinion and a final award in accordance with the Maryland Uniform Arbitration Act, and the arbitrator's award may be entered in any court having jurisdiction.

Each party will bear its own fees, costs, and expenses of an arbitration proceeding, including costs of witnesses, travel, attorneys, and other representatives. Unless otherwise required by AHLA rules or the decision of an AHLA arbitrator, the general costs and expenses of the arbitration, such as facility rental fees and the costs and expenses of the arbitrator and the AHLA, will be shared equally by the physician and the Hospital.

If the dispute involves a termination of the physician's employment, the effective date of the termination will not be postponed or otherwise affected by the pendency of any arbitration proceedings.

## 15. Termination

When the Hospital employs a physician, it expects the physician will remain a Hospital employee for the entire term of employment specified in the Letter of Agreement. Only in extraordinary circumstances will the Hospital seek to end a physician's employment prematurely. Similarly, the Hospital expects a physician to honor his/her commitment and remain an active employee for the entire agreed-upon term.

Nevertheless, there are circumstances in which early termination of employment is warranted. A physician's employment may be terminated prior to the end of the period specified in the Letter of Agreement as follows:

a. By the mutual agreement of the Hospital and the physician.

b. By the Hospital, upon the physician's disability. For this purpose, a physician will be considered disabled if he/she is unable to provide services for more than 90 consecutive days or more than 180 days in any consecutive 365-day period. Brief and intermittent interruptions of a period of disability that are occasioned by a physician's attempts to return to work will not, of themselves, prevent that period from being considered one of continuous and uninterrupted inability to perform his/her duties.

c. By either the Hospital or the physician, in the event the other has materially breached the terms of the physician's Letter of Agreement or this document. However, if the breach could potentially be cured within 30 days or less and the breaching party has not previously been given notice of a similar breach, the physician's employment shall not be terminated unless the breaching party has been given written notice of the breach and does not cure the breach within 30 days of receiving that notice.

d. Immediately by the Hospital, without a cure period, upon the happening of any of the following:

(1) the loss, limitation, or suspension (other than temporary suspensions lasting five days or less for delinquent medical records) of the physician's clinical privileges at the Hospital or any of the other institution named in the Letter of Agreement for any reason, or at any other health care institution for reasons relating to patient care;

(2) the physician's provision of services (administrative or clinical) while under the influence of alcohol, drugs, or other mood-altering substances in contravention of standards of good medical practice or Hospital rules or policy, or the physician's commission of any other act that materially violates the Professional Standards subsection of this document;

(3) the physician's repeated, willful failure to follow the reasonable instructions of the Chief or other individual with the authority to direct the physician's activities;

(4) censure of, or the imposition of any other disciplinary action against, the physician by any professional medical board, institution, organization, or professional society having any privilege or right to pass upon the physician's conduct;

(5) the physician becomes uninsurable for professional liability insurance at standard rates;

(6) the loss, limitation, or suspension of any of the physician's professional licenses or board certifications or of the physician's right to practice medicine or to participate in Medicare or the Maryland Medicaid program;

(7) the physician's conviction of a crime, other than a minor traffic violation; or

(8) other serious misconduct by the physician that the Hospital determines poses a threat to the health or safety of Hospital patients, staff, or visitors or the orderly operation of the Hospital, such as theft, abuse, any type of harassment, violent behavior or threat of violence, or similar acts.

The Hospital's obligations to a physician will cease automatically upon the physician's death.

The Hospital will be entitled to withhold from a physician's final paycheck(s) any amounts owed by the physician to Sinai or any Sinai affiliate, including, without limitation, any incentive compensation that was paid to physician but was not earned, in accordance with Section 5 hereof.

If the Hospital has reason to believe that the physician has violated the terms of his/her employment but the Hospital does not wish to permanently sever the physician's employment, the Hospital may, in addition to any other action the Hospital has the right to take, suspend the physician without pay for up to 14 days.

The Hospital may at any time, for good cause as determined by the President in his/her discretion, remove some or all of a physician's administrative duties and accompanying title. So long as such action does not result in a reduction in the physician's compensation, such action will not constitute a breach by the Hospital of the physician's Letter of Agreement or this document. Any adjustment to a physician's compensation or time allocation resulting from the

removal of administrative duties will be documented in an amendment to the physician's Letter of Agreement.

If the Hospital terminates a physician's employment pursuant to Subsection c. or d. above, the Hospital may also rescind, in whole or in part, the physician's medical staff privileges, and the physician will be deemed to have waived his/her appeal rights as provided for in the Hospital's medical staff bylaws.

If the Hospital terminates a physician's employment in a manner not permitted by this document or the physician's Letter of Agreement, the physician's total damages for such breach by the Hospital, and the Hospital's total liability to the physician, shall be limited to the lesser of (a) one times the physician's then-current annual base salary, or (b) the base salary the physician would have earned through the end of the then-current term.

**16. <u>Amendments</u>**

The terms of a physician's Letter of Agreement may be modified only by means of a written document that is signed by both the physician and the President. Similarly, no departure from these standard terms and conditions with respect to a particular physician will be binding unless specifically set out in a valid Letter of Agreement or in a modification thereof.

If Sinai is advised by reputable health care counsel that the performance by either party of any of its obligations under the Letter of Agreement or these standard terms and conditions would violate any material law or regulation, or would present a substantial risk of the loss or restriction of Sinai's or the physician's license, tax exemption, or right to participate in Medicare, Medicaid, or any other governmental program, then Sinai may, upon written notice, require the physician to enter into good faith negotiations to renegotiate the terms of the Letter of Agreement or this document, in a manner that attempts to retain as much as possible of the economic arrangements originally contemplated by the parties without violating any applicable legal, tax, or reimbursement requirements. If the parties are unable to reach an agreement within 60 days after the date of the notice seeking renegotiation (or sooner if required by law), then either party may immediately terminate the physician's employment by written notice to the other party.

**17. <u>Miscellaneous</u>**

A notice given pursuant to a Letter of Agreement or these standard terms and conditions will not be effective unless given in writing. Notices to a physician may be delivered personally, sent by e-mail to the physician's regular LifeBridge e-mail address, or sent to the physician's residence as listed in the Hospital's personnel records. Notices to the Hospital are to be sent or personally delivered to:

Sinai Hospital of Baltimore, Inc.<br>2401 West Belvedere Avenue<br>Baltimore, Maryland 21215<br>Attention: President

Notices will be deemed to have been received upon actual receipt or the second business day after mailing, whichever occurs first. An e-mail notice to a physician that has been opened, as documented by the LifeBridge e-mail system, will be deemed to have been received by the physician.

Because the duties to be rendered by physician employees are personal in nature, a physician may not assign any of his/her rights or obligations as a Hospital employee to any other person or entity. The Hospital may assign its rights and obligations as a physician's employer to any affiliate or subsidiary of the Hospital or of LifeBridge.

If a physician is obligated under the Letter of Agreement to maintain clinical privileges at another institution, the physician will be required to meet the same standards with respect to that institution that the physician is required to meet with respect to Sinai.

In the event any term or condition governing a physician's employment, including any provision of this document, is found to be unenforceable or void either in whole or in part, the offending term will be construed as valid and enforceable to the extent permitted by law and the remaining terms and conditions of employment will remain in effect.

By overlooking or waiving one breach of the terms of employment, neither the physician nor the Hospital gives up the right to take action based on another or a future breach.

The terms of a Letter of Agreement, together with these standard terms and conditions and the Hospital's and LifeBridge's policies, constitute the only legally binding terms and conditions governing a physician's employment by the Hospital.

Letters of Agreement and these standard terms and conditions will be governed by, and construed in accordance with, the laws of the State of Maryland.

*Effective July 24, 2019*